No. 2--02--0262
   
     
 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In re
 ROBERT S.
, Alleged to be a
  
   )  Appeal from the Circuit Court

Person in Need of Involuntary   )  of Kane County.

Psychotropic Medication   )  

   )  No. 01--MH--261  

(The People of the State of      )     

Illinois, Petitioner-Appellee,      )  Honorable

v. Robert S., Respondent-      ) Franklin D. Brewe,

Appellant).      ) Judge, Presiding

JUSTICE GROMETER delivered the opinion of the court:

Respondent, Robert S., appeals from an order of the circuit court of Kane County granting the State's petition to involuntarily administer psychotropic medication.  We affirm.

I.  BACKGROUND

Respondent was charged with a crime not specified in the record.  Subsequently, respondent was found unfit to stand trial and admitted to the Elgin Mental Health Center (EMHC).  On November 19, 2001, respondent's psychiatrist, Dr. Romulo Nazareno, filed a petition seeking to involuntarily administer psychotropic medication to respondent.  A hearing on the petition was originally scheduled for November 26, 2001.  However, it was continued four times, and it not did commence until January 18, 2002.  Respondent represented himself at the hearing.

On January 18, 2002, the State indicated it was ready to proceed.  However, respondent requested a two-week continuance in order to subpoena his witnesses.  The State objected and suggested that the court begin the hearing, noting that it was unlikely that the hearing could be completed in one day.  The trial court decided to commence the hearing with the understanding that after the State presented its case, the matter would be continued to give respondent time to subpoena his witnesses.

The State's first witness was Dr. Nazareno.  Dr. Nazareno diagnosed respondent with paranoid schizophrenia.  Dr. Nazareno testified that respondent's symptoms included hallucinations, delusions, and a deterioration in the ability to function.  For instance, respondent complained of sleep deprivation as a result of auditory hallucinations.  Moreover, respondent believed that the government implanted a microchip in his brain in an effort to read his mind.  Respondent claimed that EMHC staff and patients were sending messages to a "mind reader" by actions such as rubbing their chins or adjusting their eyeglasses.  In addition, respondent threatened to kill an EMHC patient who respondent believed was having a relationship with women intended for respondent.  

Dr. Nazareno noted that respondent's symptoms subsided when he was medicated on a previous occasion.  However, once the medication order expired, defendant began hearing voices, having trouble sleeping, and believing that female celebrities had fallen in love with him.  Respondent also threatened to kill a member of the EMHC staff.

Dr. Nazareno recommended administering Risperidone to respondent because in the past
 he responded well to the drug, without
 side effects.  As alternatives, Dr. Nazareno recommended Haldol, Haldol Deconate, and, for side effects, Cogentin.  Dr. Nazareno opined that the benefits of administering the psychotropic medication would outweigh the harm.  He also stated that respondent lacks the capacity to make a reasoned decision about potential side effects and benefits of the treatment.  According to Dr. Nazareno, respondent's psychosis is the reason he cannot make a knowledgeable decision whether to take the medication.  Dr. Nazareno tried less restrictive treatments, such as counseling and group therapy, but they were not effective without medication.

On cross-examination, Dr. Nazareno admitted that respondent never threatened him and that he has never personally witnessed respondent threaten others.  Dr. Nazareno also acknowledged that during the court proceeding, he did not see a deterioration in respondent's functioning and noted that respondent did not exhibit his ususal symptoms, such as talking to himself.  However, Dr. Nazareno stated that respondent's behavior and the way in which he asked questions showed some paranoia and delusions.  For instance, during questioning, respondent insinuated that Dr. Nazareno hears voices.  Dr. Nazareno pointed out that there are times during which an individual can contain delusions by focusing on a task.

Over respondent's objection, the State called Lesley Kane, an intern at the Kane County Diagnostic Center (KCDC).  Kane conducted a court-ordered independent examination of respondent.  Kane's examination consisted of interviewing respondent for 60 to 90 minutes, talking to respondent's case worker, and reviewing two to three years of respondent's records.  The trial court qualified Kane as an expert over respondent's objection.

Citing symptoms similar to those identified by Dr. Nazareno, Kane diagnosed respondent with paranoid schizophrenia.  With respect to whether respondent exhibited a deterioration of his ability to function, suffering, or threatening behavior, Kane stated that respondent has become increasingly tense and agitated, verbally aggressive, and more threatening.  In addition, his sexual preoccupations have increased and EMHC staff noted an increase in the use of profanity.  Kane further testified that respondent's illness has existed for a period marked by the continuing presence of symptoms, noting that respondent has had a history of delusions since the 1970s.  Kane believed that the benefits of psychotropic medication would outweigh the harm.  Kane noted that respondent's behavior poses a risk to himself and to others and that the side effects of the medication can be dealt with effectively.  Kane opined that respondent's suffering, the deterioration of his ability to function, and his violent and threatening behavior would decrease with medication.

Kane also concluded that respondent lacked the capacity to make a reasoned decision about psychotropic medication.  According to Kane, respondent is unaware of the severity of his illness.  Regarding less restrictive alternatives, Kane stated that respondent has been offered psychosocial therapy, but, because respondent does not have insight into his illness, "it doesn't seem as though that alone is going to be helpful."  Kane also noted that in individuals with schizophrenia, therapy is more of an augment to medication.  Kane opined "to a reasonable degree of psychological certainty" that respondent meets the criteria for psychotropic medication.  

On cross-examination, Kane admitted that during her independent examination of respondent she did not observe defendant suffering from delusions or hallucinations.  She also indicated that respondent did not exhibit such symptoms at the hearing.

The State recalled Dr. Nazareno.  He testified that respondent does not have the capacity to make a reasoned and rational choice regarding whether he needs medication.  Dr. Nazareno noted that respondent does not believe he is ill.  Dr. Nazareno added that respondent's judgment is so impaired by his illness that he sees only the risks, and not the benefits, of the medication.

Kelli Childress, a former assistant State's Attorney, testified that she first met respondent in 1999 when she was assigned to a hearing in which respondent was involved.  On or about October 31, 2001, Childress received a telephone call from respondent.  Respondent told Childress that he remembered her from the 1999 hearing and he had been thinking about her ever since.  Respondent accused Childress of helping the government with a scheme to read his mind.  Respondent believed that he and Childress were supposed to be together and that the government indicated to him that Childress felt the same way about him.  Respondent asked Childress if she would help him get out of EMHC so that they could be together.  Childress told respondent that she was involved with someone else and that the information he had was incorrect.  Childress stated she felt threatened during the conversation.

Respondent called Childress again on December 31, 2001.  According to Childress, the tone of this conversation was less accusatory and more romantic.  Respondent told Childress that she was beautiful, that he had feelings for her, and that the government informed him that they were supposed to be together.  Respondent stated that he thought about marrying Childress, having children, and moving to California.  Respondent told Childress that the government informed him that she was romantically involved with other patients at EMHC and with a player for the Chicago Bears.

Childress testified that she was familiar with respondent's case and why he was at EMHC.  She was afraid that if respondent believed that she was part of some government scheme to read his mind, he could become violent.  As a result, after both calls, Childress contacted the State's Attorney's office and the court liaison at EMHC.  In addition, following the first call, she contacted local police.  Childress has not heard from respondent since the second call.  On cross-examination, Childress admitted that respondent did not specifically threaten her.

Mark Thomas, a licensed clinical social worker at EMHC, testified that he is respondent's primary therapist.  Thomas stated that respondent's psychiatric diagnosis is paranoid schizophrenia.  According to Thomas, respondent's condition had been deteriorating over the four- or five-month period prior to the hearing, with increased agitation, verbal outbursts, and verbal aggression.

According to Thomas, respondent believes that the voices he hears are caused by a chip implanted by the government.  Respondent believes that the chip enables the government to read his mind.
  On two occasions in the three months prior to the hearing, respondent became agitated with Thomas because respondent believed that Thomas was "signaling the mind readers" by rubbing his limbs.  A third incident occurred when Thomas sided with a technician who had a dispute with respondent.  At that time, respondent cursed at Thomas within inches of his face.  Thomas considered respondent's behavior during the third incident to constitute a threat.  

Thomas testified that respondent told him that he suffers from hallucinations and delusions.  The hallucinations and delusions center on female celebrities, but have included staff at EMHC.  In addition, respondent told Thomas that
 he wanted to have a relationship with Childress and he hoped to have babies.  Respondent also told Thomas that his conversations with Childress had gone well and that she had been receptive.

Thomas also stated that respondent believes that certain women have been "reserved" for him by the mind readers.  Respondent becomes verbally abusive when he believes these women have ignored him or when he believes the women have been having relationships with other EMHC patients.  Respondent confronted one patient who he believed was having a sexual relationship with one of his "reserved" women.

Thomas opined that respondent suffers as a result of hearing voices.  Thomas believed that respondent's ability to function has deteriorated in the three months prior to the hearing.  Thomas also  stated that of the 36 patients he is in charge of or monitors, respondent poses the highest risk.  Thomas stated that respondent is "in the upper echelon" of patients of who frighten him.  

On cross-examination, Thomas testified that respondent has a "remarkable ability" to contain his psychosis.  Nevertheless, he thought that respondent had exhibited evidence of mental illness in the courtroom.  For instance, Thomas noted respondent's allusions to government mind readers and his claim that the government implanted a chip in his body.

The State then called respondent as a witness.  Respondent objected.  The trial court sustained respondent's objection on the basis that respondent was at EMHC because he was found unfit to stand trial in an underlying criminal proceeding.  The State then rested.  Respondent requested two weeks to subpoena his witnesses, and the court continued the matter until February 1, 2002.

At that time, respondent first called Denise Dojka, Psy.D., a clinical psychologist at EMHC and respondent's psychological therapist.  She stated that respondent suffers from paranoid schizophrenia.  Dojka has never seen respondent participate in any violent behavior.  Nevertheless, based on a risk assessment she conducted of respondent, Dojka believed that he was one of the more dangerous people in his unit.

On cross-examination, Dojka testified that respondent hears voices that call him derogatory names and wake him at night.  Respondent believes that the voices are from the government and that they are transmitted through an implant in his head.  The voices inform respondent that women who would like to have a sexual relationship with him are being brought to other patients.  Respondent told Dojka that he would have liked to have a relationship with Childress and that he wanted Childress to have his children.  However, he no longer believed that it was possible to have a relationship with Childress because he believes that Childress was given large sums of money to have sex with another patient who respondent believes is inferior to himself.  

Dojka testified that she considered respondent dangerous because he has several risk factors.  According to Dojka, respondent's history of violence, symptoms of mental illness, refusal of treatment, anger, and the lack of feasibility of future plans all contribute to a finding that respondent has at least a moderate risk of committing violence in the future, especially since he is not medicated.  

Dojka feared that respondent would commit violence against Childress and Lynette Krueger, Dojka's diagnostic psychology student.  Respondent wanted to have relationships with these women, but he believed that they were sleeping with others.  This made respondent feel betrayed and resentful.

Dojka believed that respondent needs to be medicated.  She noted that on a previous occasion he was medicated for a 90-day period and his sleeping improved, he was much more relaxed, he participated in activities, and he seemed to be functioning at a higher level.  Dojka also believed that respondent is suffering.  She noted that he told her he felt "tormented" by the voices.

Becky Mitchell, an activity therapist at EMHC, testified that between October 2001 and February 2002, she accompanied respondent to two or three activities.  Mitchell testified that during these activities, respondent did not cause her any problems and he did not have any problems with the other patients.  However, Mitchell opined that respondent had the potential to be dangerous to others.  Mitchell's opinion was based on respondent's status as a mental health patient, the statements of clinicians, and her past experiences with other patients.  On cross-examination, Mitchell testified that respondent told her that he hears voices that "torment" him.

Respondent's last witness was Jose Padilla, an activity staff member at EMHC.  Padilla testified that he never had to restrict respondent as a result of his behavior.  Padilla did not observe respondent express any anger towards other patients.  On cross-examination, Padilla acknowledged that he sees respondent only
 about once a month.

The trial court found respondent subject to the involuntary administration of medication for a period not to exceed 90 days.  In addressing the factors relied on in making its determination, the trial court noted, among other things, that respondent lacked the capacity to make a reasoned decision about the treatment.  The trial court denied respondent's motion to reconsider, and this timely appeal followed.

II. ANALYSIS

Before addressing the merits of respondent's appeal, we note that this case is moot.  The trial court order authorizing the administration of psychotropic medication was limited to a period of 90 days.  That period has long since passed.  Nevertheless, because this case involves "an event of short duration which is 'capable of repetition, yet evading review' " (
In re Barbara H.
, 183 
Ill. 2d
 482, 491 (1998), quoting 
In re A Minor
, 127 
Ill. 2d
 247, 258 (1989)), we will address the issues raised by respondent.  See 
In re Cathy M.
, 326 Ill. App. 3d 335, 339 (2001).

Initially, respondent claims that the trial court's order should be reversed because 
it fails to comply with section 2--107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code or Code) (405 ILCS 5/2--107.1 (West 2000)) in three respects.  First, respondent argues that the hearing on the petition to administer psychotropic medication was held outside the statutorily mandated time frame.  Second, respondent contends that the court's order does not designate the persons authorized to administer the medication.  Third, respondent asserts that the petition listed a criterion for involuntary treatment that is no longer recognized by statute.  These inquiries constitute questions of law, which we review 
de novo
.  
In re M.A.
, 293 
Ill. App. 3d
 995, 998 (1997).  We address each contention in turn.

Respondent first argues that the State failed to comply with the timing provisions for a hearing on a petition to administer psychotropic medication.  According to respondent, section 2--107.1(a--5)(2) of the Code (405 ILCS 5/2--107.1(a--5)(2) (West 2000)) requires the trial court to hold a hearing on a petition to administer psychotropic medication no later than 42 days after the petition is filed.  Respondent notes that the hearing in this case did not commence until 60 days after the petition was filed.  Accordingly, respondent urges reversal of the trial court's order.

Section 2--107.1(a--5)(2) governs the time frame within which the trial court must hold a hearing on a petition to involuntarily administer psychotropic medication.  That provision provides in relevant part:

"The court shall hold a hearing within 7 days of the filing of the petition.  The People, the petitioner, or the respondent shall be entitled to a continuance of up to 7 days as of right. An additional continuance of not more than 7 days may be granted to any party (i) upon a showing that the continuance is needed in order to adequately prepare for or present evidence in a hearing under this Section or (ii) under exceptional circumstances. The court may grant an additional continuance not to exceed 21 days when, in its discretion, the court determines that such a continuance is necessary in order to provide the recipient with an examination pursuant to Section 3-803 or 3-804 of this Act, to provide the recipient with a trial by jury as provided in Section 3-802 of this Act, or to arrange for the substitution of counsel as provided for by the Illinois Supreme Court Rules."  405 ILCS 5/2--107.1(a--5)(2) (West 2000).

Here, the petition to administer psychotropic medication was filed on November 19, 2001.  Pursuant to section 2--107.1(a--5)(2), the trial court was required to hold a hearing within seven days.  In fact, a hearing on the petition was scheduled for November 26, 2001.  The record suggests that at the November 26 hearing, the trial court denied respondent's motion to proceed 
pro se
.  The court then continued the matter on respondent's motion until November 30, 2001.

On November 30, 2001, the trial court denied respondent's motion to reconsider its decision denying respondent's request to represent himself.  Respondent then moved for an independent examination to be conducted by F.P. Johnson.  See 405 ILCS 5/2--107.1(a--5)(2), 3--804 (West 2000).  The trial court granted respondent's motion for an independent examination and continued the cause to December 21, 2001.  See 405 ILCS 5/2--107.1(a--5)(2) (West 2000) (granting trial court the discretion to continue matter for a period not to exceed 21 days in order to provide the recipient with an examination pursuant to Section 3--804 of the Code).  
However, the court appointed the KCDC to conduct the examination.

The record reflects that on December 21, 2001, the trial court entered an order continuing the matter until January 4, 2002, on respondent's motion.  On January 4, 2002, respondent renewed his motion to represent himself.  The trial court granted the motion.  The court then entered an order continuing the matter until January 18, 2002.  The record shows that the matter was continued "on the State's motion for cause, Respondent agreeing to such motion, also seeking cont[inuance]."  On January 18, 2002, the State indicated it was ready to proceed.  However, respondent requested a two-week continuance in order to subpoena his witnesses.  The State objected and suggested that the court begin the hearing, noting that it was unlikely that the hearing could be completed in one day.  The trial court decided to commence the hearing with the understanding that after the State presented its case, the matter would be continued to give respondent time to subpoena his witnesses.  Consequently, the hearing on the petition did not commence until 60 days after the petition was originally filed.

In interpreting the Code's procedural safeguards, this court has advocated strict construction in favor of the 
respondent.  
In re Janet S.
, 305 
Ill. App. 3d
 318, 320 (1999).  However, it is well established that when a party acquiesces in proceeding in a certain manner, he cannot later complain prejudice on appeal.  
Hill v. Cowan
, 202 
Ill. 2d
 151, 159 (2002) ("[O]ne cannot complain of error which he induced or in which he participated at trial"); see also 
People v. Villarreal
, 198 
Ill. 2d
 209, 228 (2001)
; 
People v. Abston
, 263 
Ill. App. 3d
 665, 671 (1994)
.  Under the facts of this case, it is apparent that 
all but one of the delays in commencing the hearing on the petition were attributable to respondent.  Only the continuance granted on January 4, 2002, was not solely attributable to respondent.  However, the record reveals that the continuance on January 4, 2002, was a mutual request by both parties.  The order continuing the matter reflects that the continuance was granted on the State's motion, but that respondent agreed to the continuance and asked for a continuance himself.  Accordingly, while the hearing on the petition was not held within the statutorily mandated time frame, we decline to reverse the trial court's order because respondent either agreed to the delays or they were attributable to him.

Respondent also complains that the trial court's order violated section 2--107.1 of the Code because it did not designate the persons authorized to administer medication.  Section 2--107.1(a--5)(6) provides that an order authorizing the administration of psychotropic medication "shall designate the persons authorized to administer the authorized involuntary treatment under the standards and procedures of this subsection."  405 ILCS 5/2--107.1(a--5)(6) (West 2000).  Here, the trial court order authorizing involuntary treatment provides:

"The petition is granted, and ROBERT S[.] shall receive psychotropic medication to be administered by DR. NAZARENO (or designee whose license and credentials permit) at Elgin Mental Health Center for a period not to exceed 
90
 days."

Relying on two recent cases from this court (
In re Richard C.
, 329 
Ill. App. 3d
 1090 (2002); 
In re Cynthia S.
, 326 
Ill. App. 3d
 65 (2001)), respondent argues that the trial court's order is defective because it does not limit treatment to specific health care professionals who are familiar with his condition.  We disagree.

In 
Cynthia S.
, this court reversed the trial court order authorizing the administration of psychotropic medication because the court's order failed to designate the persons authorized to administer the prescribed psychotropic medication
.  
Cynthia S.
, 326 
Ill. App. 3d
 at 69.  In 
Cynthia S.
, the trial court order provided
 " 'The petition is granted, and Cynthia [S.] shall receive psychotropic medication (including the necessary lab work and medical examinations) to be administered by the Illinois Department of Human Services for a period not to exceed 90 days, by those staff whose license allows them to administer psychotropic medication pursuant to Illinois law.' "  
Cynthia S.
, 326 
Ill. App. 3d
 at 68.
 We found that requiring the trial court to list named individuals authorized to administer medication ensures involvement by a qualified professional familiar with the recipient's individual situation and health status.  
Cynthia S.
, 326 
Ill. App. 3d
 at 68-69.  See also 
In re Mary Ann P.
, 
202 
Ill. 2d
 393, 408 (2002) ("[W]e believe that the specificity requirement for involuntary treatment orders reflects the legislature's legitimate concern that only qualified health care professionals, familiar with the respondent's mental and physical status, be permitted to administer the treatment and that the respondent, as well as the treaters, be notified of the exact nature of the treatment authorized").

Similarly, in 
Richard C.
, this court reversed the trial court order authorizing the administration of psychotropic medication because the trial court order failed to designate the persons authorized to administer the prescribed psychotropic medication.  
Richard C.
, 329 
Ill. App. 3d
 at 1094.  In 
Richard C.
, the trial court order provided, " 'It is hereby order [
sic
] the patient is to receive haloperidol decanoate IM of 12.5-100 mg/monthly with EKG as needed to monitor respondent's cardiac state, CBC and differential blood testing yearly and blood chemistries yearly.' "  
Richard C.
,
 329 Ill. App. 3d at 1094.

The court orders in both 
Cynthia S.
 and 
Richard C.
 did not specifically list named individuals authorized to administer psychotropic medication.  In contrast, here the trial court order listed Dr. Nazareno or a designee
.  At the hearing on the petition, Dr. Nazareno, a staff psychiatrist at EMHC, testified that he is licensed to practice medicine in Illinois and to administer psychotropic medication in this state.  Furthermore, Dr. Nazareno testified that he has been treating respondent since April 1999.  Accordingly, Dr. Nazareno is a qualified professional familiar with the recipient's individual situation and health status
.

Respondent argues, however, that allowing a "designee" to administer the medications runs contrary to established case law.  See 
In re Jennifer H.
, 333 
Ill. App. 3d
 427, 431 (2002) (holding trial court's involuntary treatment order invalid for failure to list persons authorized to administer treatment); 
Cynthia S.
, 326 
Ill. App. 3d
 at 68-69.  According to respondent, the trial court's order authorizes anyone with a license and permitting credentials to administer the medications.  We disagree.

As noted above, the trial court order authorizes the administration of psychotropic medication by Dr. Nazareno "or designee whose license and credentials permit."  A "designee" is defined as "[a] person who has been designated to perform some duty or carry out some specific role."  Black's Law Dictionary 457 (7th ed. 1999).  We read the trial court order as allowing Dr. Nazareno to name, in his absence, an individual whose license and credentials permit him or her to administer the medication to respondent.  This interpretation recognizes the reality that Dr. Nazareno may not always be available to personally administer the prescribed treatment.  It also reinforces the concern of the legislature by ensuring that respondent's treatment is administered under the guidance of Dr. Nazareno, a qualified health care professional who is familiar with respondent's situation and health status.
  Thus, we find that the trial court's order complied with section 2--107.1(a--5)(6) of the Code.

Respondent next contends that the petition did not comply with section 2--107.1 of the Code because it listed "disruptive behavior," which is no longer a statutory prerequisite for involuntary treatment.  According to respondent, the inclusion of this factor in the petition resulted in an invalid pleading, which prejudiced him.  We disagree.

Prior to June 2, 2000, section 2--107.1 of the Code authorized the involuntary administration of psychotropic medication if, among other things, the State proved by clear and convincing evidence that the recipient had a serious mental illness or developmental disability and that because of said condition, "the recipient exhibits any one of the following: (i) deterioration of his ability to function, (ii) suffering, (iii) threatening behavior, or (iv) disruptive behavior."  405 ILCS 5/2--107.1(a)(4)(B) (West 1998).  Effective June 2, 2000, the legislature amended section 2--107.1 to delete the reference to "disruptive behavior."  Pub. Act 91--726, eff. June 2, 2000 (amending 405 ILCS 5/2--107.1 (West 1998)).  See 
Jennifer H.
, 333 
Ill. App. 3d
 at 431.

In the present case, the petition to administer involuntary medication consisted of a preprinted form completed and signed by Dr. Nazareno.  Among other things, the petition stated that respondent refuses to submit to treatment by psychotropic medication, that he lacks capacity to give informed consent, and that because of his mental illness, respondent "exhibits any one of the following; [
sic
] 
deterioration of ability to function
, 
suffering
, 
threatening behavior
, or disruptive behavior."  (Emphasis in original.)  In examining the petition, it is apparent that Dr. Nazareno underscored the terms "deterioration of ability to function," "suffering," and "threatening behavior."  By preparing the form in this manner, we believe that it was Dr. Nazareno's intention to proceed on the petition by demonstrating that respondent suffered from a serious mental illness and that he exhibited a deterioration of his ability to function, suffering, or threatening behavior.  It would have been better practice to excise the term "disruptive behavior" from the petition.  Nevertheless, we cannot say that the presence of the term in the petition rendered the pleading invalid.

Moreover, as respondent concedes, the trial court did not mention the "disruptive behavior" factor in making its decision.  Instead, the court found that the State had proven by clear and convincing evidence that respondent had experienced a deterioration in his ability to function, was suffering, and had displayed threatening behavior.  Thus, we fail to see how respondent was prejudiced.

Next, respondent argues that the trial court's order must be reversed because the State failed to prove by clear and convincing evidence that respondent lacked the capacity to make a reasoned decision about the proposed treatment.  More specifically, respondent asserts that the State failed to present sufficient evidence that he was informed in writing about the risks and benefits of the proposed course of medication.

When reviewing the sufficiency of the evidence, a court of appeals will reverse the fact finder's determination only if it is against the manifest weight of the evidence.  
In re Edward S.
, 298 
Ill. App. 3d
 162, 165 (1998).  A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.  
Edward S.
, 298 
Ill. App. 3d
 at 165.

Section 2--107.1(a--5)(4)(E) of the Code (405 ILCS 5/2--107.1(a--5)(4)(E) (West 2000)) provides that the State must prove by clear and convincing evidence that the recipient lacks the capacity to make a reasoned decision about the proposed course of treatment.  
Cathy M.
, 326 
Ill. App. 3d
 at 341.  To this end, the Code requires the proposed recipient's physician or the physician's designee to advise the recipient "in writing[] of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated."  405 ILCS 5/2--102(a--5) (West 2000).  If the 
patient is not informed of the side effects, risks, and benefits of the proposed involuntary treatment, the trial court order authorizing such treatment must be reversed.  
Cathy M.
, 326 
Ill. App. 3d
 at 342; 
Edward S.
, 298 
Ill. App. 3d
 at 166.

In both 
Cathy M.
 and 
Edward S.
, we reversed the trial court orders authorizing the administration of psychotropic medication because the State failed to present clear and convincing evidence that the respective respondents were informed of the risks and the benefits of the proposed course of treatment.  
Cathy M.
, 326 
Ill. App. 3d
 at 343; 
Edward S.
, 298 
Ill. App. 3d
 at 166.  In 
Cathy M.
, the respondent was not given any written information regarding the proposed treatment.  
Cathy M.
, 326 
Ill. App. 3d
 at 342.  In 
Edward S.
, there was hearsay testimony regarding the contents of a note given to the respondent by a doctor.  However, this court held that this evidence was insufficient to demonstrate that the State provided the respondent with the necessary information from which he could make an informed decision.  
Edward S.
, 298 
Ill. App. 3d
 at 166.

In contrast, the record discloses that Dr. Nazareno informed respondent in writing about the side effects, risks, and benefits of the proposed involuntary treatment.  Dr. Nazareno testified that on several occasions he discussed psychotropic medication with respondent.  According to Dr. Nazareno, when he tried to discuss the drugs he wished to administer, respondent
 told him he did not need the medication.  Dr. Nazareno also testified that when he attempted to give respondent
 information regarding each drug, respondent
 told him that he "knows the medication."  Dr. Nazareno testified that the last time he tried to give respondent information about the drugs was two or three weeks before the hearing.
  At that time, respondent stated that "he [did] not need it."  Thus, it appears that each time Dr. Nazareno attempted to present respondent with written information, respondent refused to accept the information.  We cannot accept respondent's request that we reverse the trial court's order where his own actions made it impossible for Dr. Nazareno to accomplish his statutory duties.  
See 
In re Barry B.
, 295 
Ill. App. 3d
 1080, 1086 (1998).  Based on this evidence, we cannot say that the trial court's order to administer psychotropic medication was against the manifest weight of the evidence.

Respondent next challenges the trial court's decision to appoint psychologist Leslie Kane as an independent examiner.  Respondent asserts that the trial court erred in qualifying Kane as an expert because she lacked sufficient education and training in the field of psychiatric medicine.  
Alternatively, respondent argues that the trial court should have limited Kane's testimony to "non-psychiatric subjects."

Whether an individual is an expert is a matter generally reserved to the sound discretion of the trial court.  
People v. Miller
, 173 
Ill. 2d
 167, 186 (1996).  An individual will be allowed to testify as an expert where his or her experience and qualifications provide him or her with knowledge that is not common to laypersons and where the testimony will aid the trier of fact in reaching its conclusions.  
People v. Henney
, 334 
Ill. App. 3d
 175, 184 (2002).  There is no precise requirement as to how the expert acquires specialized knowledge or experience.  
People v. Novak
, 163 
Ill. 2d
 93, 104 (1994).  An expert may develop expertise through research, education, scientific study, training, practical experience, or a combination of each.  
Miller
, 173 
Ill. 2d
 at 186; 
Novak
, 163 
Ill. 2d
 at 104.  At least one court has concluded that an expert's education alone is sufficient to qualify him or her as an expert.  
In re J.J.
, 327 
Ill. App. 3d
 70, 79 (2001) (finding that trial court did not err in qualifying witness as an expert where witness had bachelor's and master's degrees in psychology and was working on his doctorate in the same field).  We will not reverse the trial court's determination absent an abuse of discretion.  
Henney
, 334 
Ill. App. 3d
 at 184.

Here, the record shows that Kane was not licensed to practice psychology.  However, Kane testified that she performed the examination of respondent under the supervision of a licensed clinical psychologist.  Moreover, she testified regarding her education and experience.  Kane had a bachelor's degree in psychology and a master's degree in counseling psychology.  At the time of the hearing, Kane was completing her eighth and final year in a doctorate program.  While Kane was working towards her master's degree, she interned at a counseling agency where she worked with adolescents and their families.  After completing her master's degree, Kane spent eight years at a community counseling center where she performed crisis intervention counseling for juvenile delinquents.  Kane also worked as an extern at the Kane County Diagnostic Center and the Cook County jail.  In September 2001, Kane started an internship at the Kane County Diagnostic Center.  According to Kane, she has extensive experience with psychiatric and psychological patients.  In addition, Kane testified that she had previously testified in court as an expert.  The trial court qualified Kane as an expert because she had previously testified in court as an expert witness.

Although we do not necessarily agree that the fact that Kane previously testified as an expert in court was a sufficient basis to qualify her as an expert on this occasion, we
 may affirm the result below on any basis that is supported by the record.  
Krilich v. American National Bank & Trust Co. of Chicago
, 334 
Ill. App. 3d
 563, 573 (2002).  In this case, we find that the combination of Kane's education, training, and experience provided a valid basis to qualify her as an expert.

Moreover, we do not accept respondent's alternate argument that the trial court should have limited 
Kane's testimony to nonpsychiatric subjects.  As respondent notes in his brief, the primary difference between a psychiatrist and a psychologist is that the former has the power to prescribe controlled substances while the latter does not.  See 
People v. McDonald
, 186 
Ill. App. 3d
 1096, 1100 (1989).
  Here, although Kane testified that she believed that the administration of psychotropic medications would benefit respondent, she did not testify regarding the type or dosage of the psychotropic medications Dr. Nazareno wanted authorization to administer
 to respondent.  Accordingly, we find that the trial court's decision did not constitute an abuse of discretion.

Respondent also claims that the admission of Kane's testimony deprived him of due process.  According to respondent, the trial court should have appointed a psychiatrist as an independent examiner.

Section 3--804 of the Code governs independent examinations in mental health proceedings.  That provision provides in relevant part:

"The respondent is entitled to secure an independent examination by a physician, qualified examiner, clinical psychologist, or other expert of his choice.  If the respondent is unable to obtain an examination, he may request that the court order an examination to be made by an 
impartial medical expert
 pursuant to Supreme Court Rules 
or by a qualified examiner, clinical psychologist or other expert
."  (Emphasis added.)  405 ILCS 5/3--804 (West 2000).

Whether the statute mandates the appointment of a psychiatrist is a question of statutory construction, which we review 
de novo
.  
People v. Roake
, 334 
Ill. App. 3d
 504, 510 (2002).  The primary rule of statutory construction is to ascertain and give effect to the legislature's intent.  
Regency Savings Bank v. Chavis
, 333 
Ill. App. 3d
 865, 867 (2002).  Generally, the most reliable indicator of legislative intent is the plain language of the statute.  
In re Kenneth F.
, 332 
Ill. App. 3d
 674, 684 (2002).  The plain language of section 3--804 of the Code does not require the trial court to appoint a psychiatrist as an independent examiner.  Rather, the statute allows the court to appoint
 an impartial medical expert pursuant to supreme court rules or a qualified examiner, clinical psychologist, or other expert.
  As we previously discussed, Kane was properly qualified as an expert.

Despite the plain language of the statute, respondent insists that he was deprived of due process by the trial court's failure to appoint a psychiatrist as his independent examiner.  According to respondent, the trial court's decision to appoint a psychologist effectively foreclosed any chance that he could obtain a judgment in his favor.  Citing to 
In re Ashley K.
, 212 
Ill. App. 3d
 849 (1991), respondent contends that the trial court was required to accept the testimony of the State's psychiatric experts over any testimony by experts in the field of psychology that he presented. 

In 
Ashley K.
, the trial court entered an order precluding the subject minor from undergoing any therapy and from visiting her former foster parents.  In so acting, the trial court rejected the testimony of two child psychiatrists, Drs. Leventhal and Zinn, in favor of the testimony of two other individuals, the minor's therapist and Anne Brown, a licensed psychologist.

On appeal, the reviewing court noted that Brown was not a medical doctor and that at the time Brown testified, she had been a licensed psychologist for only 3½ years and had not seen or spoken to the minor in almost 3 years.  Brown's testimony was based on reports from medical experts which Brown deemed "confusing."  The minor's therapist had been out of school for only 1½ years and had been licensed for only 9 months.  In addition, the court took judicial notice that another court had cast doubt on Brown's conclusions and held that her testimony was questionable because it was based on a test she was too inexperienced to administer.  In contrast, Dr. Leventhal 
had been a medical doctor for 16 years and had been board certified in child adolescent psychiatry for 10 years.  Dr. Zinn had been a medical doctor for 20 years and board certified in child psychiatry for 13 years.  The court then stated:

"The circuit court cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence.  Moreover, the circuit court, itself, cannot second-guess medical experts.  If the circuit court does not follow medical evidence that is not refuted by other medical evidence, the circuit court is acting contrary to the evidence."  
Ashley K.
, 212 
Ill. App. 3d
 at 890.

It is this language from 
Ashley K.
 that respondent claims foreclosed any chance that the trial court would rule in his favor.

We question the applicability of this language from 
Ashley K.
 to the present case.  First, we note that 
Ashley K.
 did not involve the interpretation of the Code.  In fact, mandating the trial court to adopt the opinion of a psychiatrist over the opinion of a psychologist in mental health cases renders the independent-examination provision of the Code virtually meaningless.  It would require the trial court to disregard language authorizing it to appoint a "qualified examiner, clinical psychologist or other expert
."  See 405 ILCS 5/3--804 (West 2000)
.  This clearly ignores the plain language of the statute.  

More importantly, however, we do not interpret 
Ashley K.
 to compel the trial court to accept psychiatric testimony over psychological testimony.  In 
In re C.B.
, 248 
Ill. App. 3d
 168 (1993), the court interpreted the passage we quote from 
Ashley K.
 as "reaffirm[ing] the notion that the best interest of the child is the paramount consideration and that qualified and competent medical testimony 
concerning the child for whom the custody decision is being made
 must not be disregarded when determining what is in the child's best interest."  (Emphasis in original.)  
C.B.
, 248 
Ill. App. 3d
 at 179.  In other words, the decision in 
Ashley K.
 turned on the credibility, or lack thereof, of the witnesses.  In this regard, we believe that Kane was a credible, qualified individual, and her appointment did not predispose the trial court to rule against respondent.  Significantly, we note that Kane's 
examination consisted of interviewing respondent for 60 to 90 minutes, talking to respondent's case worker, and reviewing two to three years of respondent's records.  Further, Kane conducted her examination just weeks before respondent's hearing, and her examination was performed under the supervision of a licensed psychologist.  Moreover, there is no indication that Kane's credentials had previously been called into question.  These factors distinguish Kane's testimony from that of the witnesses in 
Ashley K.
  Accordingly, we conclude that the trial court did not err in appointing Kane as respondent's independent examiner.

Next, respondent argues that
 section 2--107.1 of the Code "was never intended to be applied to non-dangerous pretrial detainees."  
According to respondent, when the statute is applied to such individuals, it is constitutionally infirm.  In this regard, respondent complains that section 2--107.1 fails to take into consideration the seriousness of the crime charged.  Respondent also claims that the trial court failed to determine whether he would be able to participate in a fair trial.

At the outset, we note that section 2--107.1 of the Code does not exempt pretrial detainees from its coverage.  In 
In re Evelyn S.
, 337 
Ill. App. 
3d
 1096 (2003), the Fifth District rejected the proposition that the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/100--1 
et seq.
 (West 1998)), rather than the Mental Health Code, governs the administration of psychotropic medication to pretrial detainees found unfit to stand trial.  
Evelyn S.
, 337 
Ill. App. 3d
 at 1102.  The court noted that while the Criminal Code includes procedures for the involuntary commitment of defendants found unfit to stand trial, it does not contain provisions for determining whether the treatment of a pretrial detainee found unfit to
 stand trial may include the involuntary administration of psychotropic medication.  
Evelyn S.
, 337 
Ill. App. 3d
 at 1104.  As the 
Evelyn S.
 court aptly suggested, in the absence of the procedural safeguards provided by the Mental Health Code, there would be no procedural safeguards at all.  
Evelyn S.
, 337 
Ill. App. 3d
 at 1104.
  Thus, respondent's argument that section 2--107.1 does not apply to pretrial detainees is not well taken.

    In addition, we find little merit in respondent's argument that the application of section 2--107.1 deprived him of his constitutional right to a fair trial.  In support of his position, defendant cites principally to 
United States v. Gomes
, 289 F.3d 71 (2d Cir. 2002), 
vacated & remanded
, ___ U.S. ___, ___ L. Ed. 2d ___, ___ S. Ct. ___ (2003), 
United States v. Sell
, 282 F.3d 560 (8th Cir. 2002), 
vacated & remanded
, 539 U.S. ___, ___ L. Ed. 2d ___, 123 S. Ct. 2174 (2003), and 
United States v. Brandon
, 158 F.3d 947 (6th Cir. 1998).  
In 
Gomes
, 
Sell
, and 
Brandon
, the courts addressed whether the government could forcibly administer psychotropic medication 
for the sole purpose
 of rendering a detainee competent to stand trial.  
Gomes
, 289 F.3d at 75; 
Sell
, 282 F.3d at 562; 
Brandon
, 158 F.3d at 949.  The Supreme Court recently reviewed the decision in 
Sell
, and held that the Constitution permits the involuntary administration of psychotropic medication for the sole purpose of rendering a defendant competent to stand trial "if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."   
Sell
, 539 U.S. ___, ___, ___ L. Ed. 2d ___, ___, 123 S. Ct. 2174, 2184 (2003).  See also 
Gomes
, ___ U.S. ___, ___, ___ L. Ed. 2d ___, ___, ___ S. Ct. ___, ___ (2003)
 (vacating the decision of the lower court and remanding for further 
consideration in light of 
Sell
).

Here, the trial court was not asked to decide whether respondent could be subject to the involuntary administration of psychotropic medication 
solely
 for the purpose of rendering him competent to stand trial.  Indeed, the record is barren of any evidence that the petition to administer psychotropic medication was filed solely for the purpose of fitness for trial
.  Moreover,  respondent never argues that the purpose of the State's petition was to render him fit for trial.  Instead, the trial court reviewed each of the factors listed in section 2--107.1(a--5)(4) of the Code (405 ILCS 5/2--107.1(a)(4) (West 2000)) and found that the State proved each factor by clear and convincing evidence.  The court found that respondent suffered a mental illness, the result of which resulted in a deterioration of his ability to function, suffering, and threatening behavior.  Moreover, the court found that the benefits of the proposed treatment outweighed the harm and that less restrictive alternatives were inappropriate.  It is evident that the trial court granted the State's petition because it found the involuntary administration of psychotropic medication to be medically appropriate.  Notably, in rendering its decision the trial court never mentioned respondent's fitness to stand trial.  Accordingly, respondent's reliance on 
Gomes
, 
Sell
, and 
Brandon
 is misplaced, and we reject respondent's constitutional challenges.  See 
United States v. Keevan
, 115 F. Supp. 2d 1132, 1137 (E.D. Mo. 2000) (finding procedural safeguards outlined in 
Brandon
 inapplicable where purpose of petition was to manage and prevent the recipient's dangerousness).

Lastly, respondent urges reversal of the trial court's order on the basis that the attorney in his criminal trial was not notified of the hearing on the petition.  Section 2--107.1(a--5)(1) of the Code (405 ILCS 5/2--107.1(a--5)(1)
 (West 2000)) provides that "[t]he petitioner shall deliver a copy of the petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any."  Although the statute does not require notice to the attorney representing the respondent in a criminal trial, respondent asserts that "notions of fundamental fairness and due process" require notification of his criminal defense attorney.  Respondent asserts that information regarding a client's regimen of psychotropic medication can be crucial to the criminal defense attorney at hearings on his client's fitness.

A criminal defendant is presumed fit to stand trial.  725 ILCS 5/104--10 (West 2000); 
People v. Easley
, 192 Ill. 2d 307, 318 (2000).  
Once a criminal defendant is found unfit to stand trial, the defendant must be found fit before any trial can occur.  In this regard, the Criminal Code requires the defendant's treatment supervisor to submit to the defense a written progress report containing information regarding, 
inter alia
, "the type, the dosage and the effect of the medication on the defendant's appearance, actions and demeanor."  725 ILCS 5/104--18 (West 2000).  This information must be presented to the defense under certain circumstances, including prior to the date for any hearing on the issue of the defendant's unfitness or when the treatment supervisor believes that the defendant has attained fitness.
  Thus, contrary to respondent's argument, the Criminal Code contains a provision requiring notification to a criminal defendant's attorney regarding his or her client's drug treatment.  Although this notice comes after the decision to involuntarily administer psychotropic medication has been made, it resolves respondent's concern that the criminal defense attorney be aware of a respondent's drug regimen prior to any further proceedings on the respondent's fitness.

III.  CONCLUSION

For the reasons stated above, we affirm the judgment of the circuit court of Kane County.

Affirmed.

BOWMAN and BYRNE, JJ., concur.