*In re* LINDA W., a Person Asserted to Be Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Linda W., Respondent-Appellant).

Fifth District   No. 5—03—0087

Opinion filed June 15, 2004.

Anthony E. Rothert and Elvis C. Cameron, both of Guardianship and Advocacy Commission, of Alton, for appellant.

Bill Mudge, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Kevin D. Sweeney, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

The respondent, Linda W., was involuntarily admitted into a psychiatric facility in December 2002. The State's first petition for involuntary admission was dismissed by the circuit court. The State immediately filed a second petition. A hearing was held on the second petition. The circuit court determined that the respondent was a person subject to involuntary admission and ordered that she be hospitalized in the Department of Human Services. The respondent filed a timely notice of appeal. We reverse.

The relevant facts are as follows. According to the respondent, she had been receiving medication for mental illness for 28 years. She had been diagnosed with schizoaffective disorder. Although the respondent

had been in and out of several mental health institutions over the years, she apparently did not believe that she had a mental illness and she refused to take medication for her condition.

The respondent was involuntarily admitted to Gateway Regional Medical Center (Gateway) on December 6, 2002. On December 9, 2002, a petition for involuntary admission was filed in Madison County case No. 02—MH—103. According to a certificate that was attached to the petition, the respondent had refused to take her psychiatric medication for two weeks. The respondent was angry and belligerent toward "KK and ex[-]husband." The respondent's ex-husband was attempting to care for her, but due to his own physical problems, he was unable to do so. The respondent was "morbidly obese" and unable to meet her basic needs of food, clothing, and personal hygiene without assistance. The respondent refused a voluntary placement in shelter care and offers for assistance in the home. The respondent was "exceedingly paranoid" and "delusional" about her family and anyone in the medical profession and believed that they were only trying to "control her."

The petition was involuntarily dismissed on December 19, 2002. Although the record does not show why the petition was dismissed, the respondent states that the petition was dismissed "for failure to comply with statutory pleading requirements."

On the same date, at 2:40 p.m., the State filed another petition for involuntary admission to a facility, in Madison County case No. 02—MH—106. The respondent tore up that copy of the petition and hit a nurse in the face with her fist. The first certificate to support the second petition was executed by another registered nurse following an examination on December 19, 2002, at 4 p.m. The first certificate stated that the respondent was "extremely angry, agitated, cursing, yelling, [and] throwing papers" when she was presented with a copy of the petition. The respondent tore up the petition and threw it in the nurse's face. She proceeded to strike the nurse's cheek with her fist. The respondent threatened to kill the nurse. She also threatened another nurse and told her that she would "burn in hell for a million years." The respondent physically pushed security personnel and verbally abused them. The respondent was unable to stay on one topic and screamed and yelled. She made irrational statements such as "I bleed for my kids, but they will not bleed for me," and "Why don't you kill me? I would be better off." The respondent also claimed that the hospital staff was sending air through the vents that caused all the respondent's medical problems. The respondent was later observed "shouting out" and then denied wanting anything. She claimed that she needed medical assistance and that the staff at Gateway was

incompetent. She then refused medical help. The respondent told her psychiatrist that "they enjoy controlling [her]" and later told Carol Dugan Faulk, a licensed clinical social worker, that she and the Gateway staff were poisoning her. The certificate stated that the respondent required immediate hospitalization due to her inability to care for herself and the failure to comply with both medical and psychiatric medications. For all these reasons, the certificate stated that the respondent is "at risk to self and others." A second certificate was signed by a psychiatrist, Dr. Narishma Muddasani, on December 19, 2002, at 10 p.m. Dr. Muddasani stated in the certificate that the respondent had delusional beliefs that "people are trying to poison her with the vents." He also said that the respondent was in denial about her mental illness despite her 30 years of psychiatric treatment. Dr. Muddasani stated that the respondent also had delusional beliefs that her ex-husband was "trying to kill her" and she is unable to care for herself.

The respondent filed a motion to dismiss the second petition. She claimed that it was void because she had been unlawfully detained between the time that she was served with a copy of the second petition on December 19, 2002, at 2:40 p.m. and the time that the first certificate to support the petition was executed on December 19, 2002, at 4 p.m. The circuit court denied the motion and conducted a hearing on whether the respondent was subject to involuntary admission and involuntary administration of psychotropic medication.

The testimony at the hearing was as follows. Faulk testified that the respondent had been diagnosed with schizoaffective disorder. Faulk stated that the respondent was very paranoid and disorganized. She said that the respondent threatened to kill one of the nurses. The respondent believed that the staff at Gateway was poisoning her by piping something through the air vents. The respondent also claimed that the doctors were giving her silicone and that it caused her to have medical problems. The respondent stated that her current doctor is reincarnated. The respondent also believed that the food that Gateway fed her caused her medical problems. The respondent threatened the staff and the doctor, and she almost hit a patient. She threatened to kill a nurse. Faulk recommended that the respondent continue to reside at Gateway until her condition was stabilized with medication. Faulk stated that if the respondent complied with the medication orders, she would be released on February 3, 2003.

Faulk testified that no less-restrictive facility than Gateway was available to serve the respondent's needs. Faulk opined that the respondent was unable to care for herself and was dangerous to herself and others. The respondent refused to participate in treatment or take medication.

Faulk also stated that on December 19, 2002, when the first petition was dismissed, the respondent's attorney called a cab for her. When the cab arrived, the respondent refused to get in. The respondent asked to go upstairs and gather her belongings. By the time that the respondent was ready to go, the second petition was finished, and she was readmitted. We note, however, that the petition states that within 12 hours *after* admission, the respondent was given a copy of the petition. Hence, the respondent was readmitted *prior* to 2:40 p.m., when the petition was given to her.

The respondent testified that she was 59 years old at the time of the hearing. The respondent stated that she had four admissions to psychiatric hospitals within the previous two years. She said that her legs were semiparalyzed and that she had "awful pain" in her legs due to the Haldol injections. The respondent stated that the stiffness in her legs was "severe" and that she was fearful of falling and getting hurt. She said that she was unable to get out of a bathtub. Prior to her current admission, the respondent had been staying with her ex-husband because he had a shower.

The respondent testified that she had not been overweight prior to the time that the doctors began giving her shots. She claimed that after the shots, she weighed 300 pounds. The respondent agreed that she was loud but denied that she was vicious or ferocious. She denied that she threatened to kill anyone and denied that she thought about harming herself or anyone else.

Dr. Muddasani testified that he was the respondent's treating psychiatrist. He stated that the respondent suffered from schizoaffective disorder. He opined that her disease was characterized by depression and paranoid delusions. Dr. Muddasani stated that the respondent does not believe that she has a mental illness and that, therefore, she does not understand the need for the medication. The respondent had been given Haldol and other medications for her condition. Because the respondent was refusing medication, Dr. Muddasani wanted to administer Haldol because it could be given by injection once a month. Although the respondent claimed that Haldol caused her leg paralysis, Dr. Muddasani stated that it was not a side effect of the medication. Even though the respondent was having problems with her weight, Dr. Muddasani stated that it could be controlled by diet, exercise, and good judgment. Dr. Muddasani's treatment goal was to stabilize the respondent so she could leave the hospital. He stated that the benefits of the medication outweighed the risks and that the respondent did not have the capacity to make a reasoned and informed decision regarding whether she should take the medication.

After Dr. Muddasani testified, the respondent took the stand again.

She testified that prior to her admission to Gateway, she had been taking Celexa, Topamax, and Zyprexa. These medications were prescribed by Dr. McCormick after she was released from Alton Mental Health Center. The respondent stopped taking the medications approximately one to two weeks prior to her admission to Gateway. The respondent claimed that she had been forced to take shots for 28 years. She stated that her problems with pain and paralysis in the legs began when she started Haldol injections in 1993.

The circuit court determined that the respondent was subject to the involuntary administration of psychotropic medication and to involuntary admission. The hearing was held on January 2, 2003, and the circuit court's order was filed the same day.

The respondent was discharged from Gateway on January 23, 2003, and released to the Cherrywood Health Care Center in Vandalia, Illinois. The respondent filed a timely notice of appeal on February 3, 2003. We note parenthetically that the State claims that the respondent's notice of appeal was untimely. We find no merit to the State's argument. See *Mentesana v. LaFranco*, 73 Ill. App. 3d 204, 207, 391 N.E.2d 416, 419 (1979) (the court determined that when the last day to file a notice of appeal falls on a Saturday, the notice of appeal is timely if filed on the following Monday).

■ Before addressing the merits of the respondent's appeal, we note that this case is moot. The circuit court's order authorizing involuntary admission could only be in effect for up to six months. See 405 ILCS 5/4—611(a) (West 2002). The respondent was legally discharged from Gateway on January 23, 2003. Nevertheless, since this case involves an event of short duration that is capable of repetition yet evades review, we will address the issues raised by the respondent. See *In re Robert S.*, 341 Ill. App. 3d 238, 247, 792 N.E.2d 421, 427 (2003).

Initially, the respondent claims that the circuit court's order should be reversed because she was unlawfully detained for 1 hour and 20 minutes. We agree.

■ Pursuant to section 3—602 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3—602 (West 2002)):

> "The petition *shall* be accompanied by a certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization. The certificate shall indicate that the physician, qualified examiner, or clinical psychologist personally examined the respondent not more than 72 hours prior to admission. It shall also contain the physician's, qualified examiner's, or clinical psychologist's clinical observations, other

factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under [s]ection 3—208." (Emphasis added.)

Hence, a person alleged to be subject to involuntary emergency admission cannot be taken into custody, admitted, or otherwise detained unless both a petition and a certificate have been executed. While we recognize that section 3—603 of the Code (405 ILCS 5/3—603 (West 2002)) sets forth a procedure whereby an individual can be detained until a certificate is obtained, the State failed to comply with those procedures in the instant case. While anyone can complete the petition, the requirement of a certificate ensures that a physician, qualified examiner, or clinical psychologist has recently examined the respondent and that the respondent is subject to involuntary admission and requires immediate hospitalization. 405 ILCS 5/3—602 (West 2002).

■ Although a circuit court's decision in an involuntary admission proceeding is given great deference (*In re Bennett*, 251 Ill. App. 3d 887, 888, 623 N.E.2d 942, 944 (1993)), the Code's procedural safeguards are not mere technicalities. Rather, they are essential tools to safeguard the liberty interests of respondents in mental health cases. *In re George O.*, 314 Ill. App. 3d 1044, 1046, 734 N.E.2d 13, 16 (2000). The need for strict compliance with the statutory requirements is compelling in mental health cases since commitment is involuntary and liberty interests are involved. *In re Lanter*, 216 Ill. App. 3d 972, 974, 576 N.E.2d 1219, 1220 (1991). Because involuntary admission proceedings pose a grave threat to an individual's liberty interests, the Code's procedural safeguards should be strictly construed in favor of the respondent. *In re George O.*, 314 Ill. App. 3d at 1046, 734 N.E.2d at 16. Any noncompliance with the statutorily prescribed involuntary commitment procedures renders the judgment entered in such a case erroneous and of no effect. *In re Nancy A.*, 344 Ill. App. 3d 540, 549-50, 801 N.E.2d 565, 575 (2003).

■ In the case at hand, the first petition for involuntary admission was filed on December 9, 2002, and was accompanied by two certificates signed by psychiatrists showing that the respondent needed hospitalization for the treatment of her mental illness. On December 19, 2002, the first petition was dismissed. At 2:40 p.m. the same day, the second petition for involuntary admission was served on the respondent. The first certificate that was filed to support the petition was signed about 4 p.m., and the second certificate was signed at approximately 10 p.m. A period of approximately 1 hour and 20 minutes elapsed between the time that the second petition was served and the time that the first certificate to support that petition was executed.

The State claims that the record is silent regarding whether the respondent was detained during that period of time. We note, however, that a review of the record shows that Margaret Merrell, a registered nurse, signed the second petition on December 19, 2002, at 2:40 p.m., stating that the respondent had already been readmitted to Gateway. Hence, the respondent was unlawfully detained between 2:40 p.m. and 4 p.m., when the first certificate to support the petition was signed.

For this reason, the circuit court's order finding that the respondent was a person subject to involuntary admission and ordering her to be hospitalized in the Department of Human Services is erroneous. See *In re Nancy A.*, 344 Ill. App. 3d at 549-50, 801 N.E.2d at 575.

Reversed.

KUEHN, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. It is true, as the majority points out, that section 3—603 of the Code (405 ILCS 5/3—603 (West 2002)) outlines the procedure whereby an individual may be detained pending a certificate (349 Ill. App. 3d at 443), and I believe that the State should be admonished for failing to comply strictly with that procedure in this case. However, I do not believe that the State's failure to comply should result in a reversal under the circumstances of this case. It is clear from the record that the respondent was subject to involuntary admission on December 19, 2002. Accordingly, had the State complied with the requirements of section 3—603, the result would have been the same: the respondent would have been involuntarily admitted. I believe that under these circumstances, and given the respondent's 28-year history of mental illness, the State's responsibility to protect and care for individuals who are subject to involuntary admission, as well as to safeguard innocent bystanders who might suffer from the actions of released individuals who are subject to involuntary admission, outweighs any harm caused by the State's failure to strictly comply with the procedures of section 3—603. Therefore, I respectfully dissent from the majority's decision to reverse the circuit court.