*In re* JUDITH JAKUSH, a Person Found Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Judith Jakush, Respondent-Appellant).

Fourth District   No. 4—99—0272

Argued November 17, 1999.—Opinion filed March 1, 2000.

MYERSCOUGH, J., dissenting.

Jeff M. Plesko, of Guardianship and Advocacy Commission, of Anna, and William J. Conroy, Jr. (argued), of Guardianship & Advocacy Commission, of Rantoul, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and James C. Majors (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In March 1999, the trial court involuntarily admitted respondent, Judith Jakush, to Zeller Mental Health Center (Zeller) in Peoria, pursuant to section 1—119(2) of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1—119(2) (West 1998)). Jakush appeals, arguing, in pertinent part, that the court's finding that she was unable to provide for her physical needs so as to guard against serious harm was against the manifest weight of the evidence. We agree and reverse.

## I. BACKGROUND

In March 1999, the State petitioned for Jakush to be involuntarily admitted, and the trial court conducted a hearing on that petition. The State's proof consisted of only the testimony of Dr. Albert Lo, a staff psychiatrist at Covenant Medical Center in Urbana (Covenant). Lo testified that police discovered Jakush in a car that had been reported stolen, apprehended her, and brought her to Covenant's emer-

gency room in restraints. Jakush had reportedly been hostile to the police. Lo became Jakush's physician, and he saw her on a daily basis from that point on. Lo described Jakush's condition as follows:

"Ms. Jakush feels that we are out to harm her. She has not cooperated in any way while in our unit. Only with things such as vital signs. She suffers from grandiose delusions and hyper[ ]religious delusions. She feels that she is supporting herself with donations that are then distributed through the [P]ope. She feels that the [P]ope is paying her credit card bills. She feels that she has performed a number of miracles and can heal the sick. She tells me that she is a nun but yet cannot give details on how she became a nun. She reports to me that she's worked at NBC News but cannot give me information or details about that or where the building is located. When I have asked her for individuals who could support her claims and story, she refers me to the [P]ope and Sandra Day O'Connor. She can become hostile and threatening during examination and on occasion slammed the door in my face. Pretty much for the first few days she limited her interaction to yelling at me and saying very little."

Lo opined that Jakush suffered from grandiose paranoid delusions, and he diagnosed her with "psychosis not otherwise specified and probable schizophrenia paranoid subtype," which is a mental illness. He further opined that because of her mental illness, Jakush is not able to provide for her basic physical needs so as to guard herself from serious harm. He based this conclusion on the following:

"She interacts with the rest of the world based on a false belief system. That in itself makes her a person who is in danger. She is not able to care for herself adequately. And especially in light of the contact with the police she had recently makes us feel she cannot safely care for herself. She has not appropriately interacted with other staff. She is not taking medication. She shows no understanding in the fact that she suffers from illness. She was able to display no visible means of support."

Lo testified that Jakush's physical exam revealed no abnormalities. She ate on her own and dressed herself. If her mental illness went untreated, however, she would be at risk of "exploitation" and would continue to "wander about aimlessly without any direction."

Lo testified that outpatient treatment would not be appropriate for Jakush. Appropriate therapy would include anti-psychotic medication administered to Jakush as an inpatient. At the time of the hearing, Jakush had refused to take anti-psychotic medication. The trial court asked Lo how long Jakush would be hospitalized, assuming she started taking medication upon admission; Lo estimated three to four weeks.

Jakush testified that she is a Benedictine nun affiliated with the Catholic church generally, but not with any specific church or order. She left her home in Chicago to go out on the road to minister to broken families and was on her way to southern Illinois when the police apprehended her at a rest stop on Highway 57. She carried food supplies in an ice chest in the car and ate well while on the road. She stayed at less expensive motels. She had over $450 in cash when she was apprehended.

The car Jakush was driving was rented from Enterprise Rent-A-Car (Enterprise) and had been reported stolen because the scheduled return date had passed. Jakush testified that by the time of the hearing, she had worked out a payment plan with Enterprise that she believed she would be able to honor. Her plan for the immediate future was to return to Chicago, make further arrangements for transportation, and tend to the details of paying back what she owed on the car rental.

Jakush explained that she got her money "from ministers for donations." She further explained that money comes to her from the "highest order," meaning that the Pope sends money directly to her. Before embarking on her road trip, Jakush vacated her Chicago apartment and put her belongings in storage. She explained that apartments in Chicago cost between $700 and $900 per month, making it too expensive to maintain an apartment while living on the road. She stored her belongings with Rebe Storage for $140 per month. She intended to establish a new apartment upon returning to Chicago.

The trial court found, in part, as follows:

> "Although she has been able to eat and sleep and has not apparently been the victim yet of a violent act with this type of delusional system in place, it is only a matter of time. She really does not have any visible means of support.

> * * *

> So at this time I do believe the State has shown by clear and convincing evidence that the [r]espondent is a person who is mentally ill and is unable to provide for her basic needs so as to guard herself from serious harm. She is just setting herself up and putting herself in a position for serious harm."

The court ordered Jakush to be transported to Zeller. The order was to remain in effect for 60 days, which, the court explained, would "be enough time for [Jakush] to start taking medication to get stabilized and then placed in a less restrictive environment after that." This appeal followed.

## II. ANALYSIS

### A. The Burden of Proof and the Standard of Review

■ Under section 1—119(2) of the Code, a person subject to involuntary admission is "[a] person with mental illness and who because of *** her illness is unable to provide for [her] basic physical needs so as to guard *** herself from serious harm." 405 ILCS 5/1—119(2) (West 1998). In determining whether a person's illness renders her unable to provide for her basic physical needs, a court should consider whether that person (1) can obtain her own food, shelter, or necessary medical care; (2) has a place to live or a family to assist her; (3) is able to function in society; and (4) has an understanding of money or a concern for money as a means of sustenance. *In re Rovelstad*, 281 Ill. App. 3d 956, 968, 667 N.E.2d 720, 727 (1996). Proof of mental illness alone is not sufficient to support involuntary admission. *In re M.A.*, 293 Ill. App. 3d 995, 998, 689 N.E.2d 138, 140 (1997).

■ The State must prove the basis for involuntary admission by clear and convincing evidence. *In re Knapp*, 231 Ill. App. 3d 917, 919, 596 N.E.2d 1171, 1172 (1992).

> "Courts have defined 'clear and convincing' evidence most often as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213, 647 N.E.2d 273, 276 (1995).

■ A reviewing court will not reverse an order of involuntary admission unless the trial court's conclusions are against the manifest weight of the evidence. *Knapp*, 231 Ill. App. 3d at 919, 596 N.E.2d at 1172. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo*, 164 Ill. 2d at 215, 647 N.E.2d at 277.

### B. The Evidence

■ We conclude that because the State failed to present clear and convincing evidence that Jakush was unable to provide for her basic physical needs so as to guard herself against serious harm, the trial court's ruling that she be involuntarily admitted was against the manifest weight of the evidence.

### 1. *Food, Shelter, and Medical Care*

The State presented no evidence that Jakush was unable to obtain food, shelter, and medical care. In fact, much of the evidence supports

the opposite conclusion—that is, despite her mental illness, Jakush was capable of tending to these basic needs. Jakush testified that she ate well on the road, and Lo testified that she was eating at the hospital.

The only evidence regarding Jakush's ability to secure shelter was her own unrefuted testimony, which made clear that she was capable of obtaining shelter, be it motel rooms or an apartment in Chicago. She testified that she intended to get an apartment when she returned to Chicago and she was well aware of average rents. That Jakush had no permanent residence when she was apprehended has little bearing on her ability to obtain shelter or whether she should be involuntarily admitted. See *In re Schumaker*, 260 Ill. App. 3d 723, 729, 633 N.E.2d 169, 174 (1994), quoting *In re Long*, 237 Ill. App. 3d 105, 110, 606 N.E.2d 1259, 1263 (1992) (" '[A] person is free to live on the street, if the person chooses to do so. [Citation.] A person may not be held against her will merely to improve her standard of living or because society may find it uncomfortable to see such people on the street' ").

Finally, no evidence showed that Jakush is unable to obtain medical care. According to Lo's testimony, she did not have any physical ailments when she was admitted to Covenant, and she cooperated with hospital personnel on minor medical procedures.

### 2. *Visible Means of Support*

While it would have been proper for the trial court to consider whether Jakush understood money and had "a concern for money as a means of sustenance," the court could not properly order Jakush's involuntary admission merely because she failed to provide Lo or the court with a "visible means of support." Moreover, had the court found that Jakush lacked an "understanding of money or a concern for it as a means of sustenance," such a finding would be against the manifest weight of the evidence. Lo's failure to ascertain the source of Jakush's income does not support the inference that she had no income.

Despite her reluctance to reveal her actual source of income to Lo and the trial court, the evidence suggests that Jakush was able to manage her finances and make reasoned decisions about how her money would best be spent. For example, knowing the cost of renting apartments and leasing storage space in Chicago, she concluded that storing her belongings was more cost effective than maintaining an apartment. She also testified that she successfully negotiated a payment plan with Enterprise and would be able to fulfill that obligation. When Jakush was apprehended, she had $450 in cash with her—strong evidence that she had access to funds. Merely failing to reveal a source

of income, or providing the treating physician with a false or delusional one, does not constitute a sufficient basis for involuntary admission.

### 3. *Susceptibility to Harm*

We further disagree with the trial court's conclusion that Jakush's illness made her an easy prey in a society of predators and that involuntary admission was necessary for her own protection. The State presented no evidence that Jakush had been victimized or that she was more likely to be victimized than any elderly, disabled, or otherwise vulnerable member of society. Such weakness does not warrant preemptive confinement whereby potential victims would be incarcerated in the interest of preventing criminals from preying upon them.

While commitment need not be delayed until danger is acute or someone is actually harmed (*Knapp*, 231 Ill. App. 3d at 920, 596 N.E.2d at 1173), in this case no evidence showed that Jakush was in danger of harming herself, harming others, or being harmed. The court's conclusion was based on speculation and the assumption that weaker members of society are inevitably preyed upon by the strong or criminal. The evidence of Jakush's susceptibility to harm, which consisted only of Lo's assertion, is not sufficient to warrant so significant an intrusion on Jakush's rights and liberty as her involuntary admission to a locked facility.

> "It is well established that involuntary admission procedures implicate substantial liberty interests, which must be balanced against the need to provide care for persons unable to care for themselves as well as to protect society from dangerous mentally ill persons. [Citation.] A person must not be confined against her will merely because of a mental illness if she can live safely in freedom."
> *In re Tuman*, 268 Ill. App. 3d 106, 110, 644 N.E.2d 56, 58 (1994).

### 4. *Psychotropic Medication*

Finally, we are concerned that the trial court fashioned its involuntary admission order based in part on the assumption that Jakush would begin taking psychotropic medication once admitted. While Lo testified that anti-psychotic medication would be his recommended treatment, Jakush had refused such medication at Covenant, and no evidence suggested that she would reverse her position once admitted to Zeller. Jakush's right to refuse psychotropic medication is guaranteed by statute and should not have been a ground for involuntary admission. *Schumaker*, 260 Ill. App. 3d at 730, 633 N.E.2d at 174.

Moreover, authorization to administer psychotropic medication against a patient's will requires a separate judicial proceeding, during which the State must prove the existence of all seven factors listed in

section 2—107.1(a)(4) of the Code by clear and convincing evidence. 405 ILCS 5/2—107.1(a)(4) (West 1998). Those factors encompass a myriad of factual determinations and legal conclusions that were not addressed in the proceedings that took place here.

## III. CONCLUSION

Accordingly, we conclude that the trial court's judgment was against the manifest weight of the evidence. Jakush has raised additional grounds for reversal, which we need not address.

For the reasons stated, we reverse the trial court's judgment.

Reversed.

KNECHT, J., concurs.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent since I conclude that the trial court's order finding Jakush subject to involuntary admission was not against the manifest weight of the evidence. The State, through psychiatrist Dr. Lo, established that Jakush was unable to provide for her own basic physical needs so as to guard herself from serious harm. The doctor testified that Jakush suffered from a mental illness, psychosis, and probable schizophrenia paranoid subtype with grandiose delusions and hyperreligious delusions. The doctor testified that her false belief system placed her in danger and left her unable to care for herself. The doctor recounted hostile and threatening behavior toward him, and Jakush did not interact appropriately with hospital staff. The record reflects similar combative behavior when the police arrested Jakush for possession of a stolen car.

Though she claimed to possess $450, she had failed for some time to pay her car rental. At the time of Jakush's arrest, she was living out of the rental car she claimed to have driven to all the states in the last six months, and, according to Jakush, she had been "ministering to millions." She also claimed to have performed miracles and healed the sick. She could provide no details about where she lived or worked. She reported having no surviving family members or other human contact.

Jakush said that she received her support from the Pope and communicated with Sandra Day O'Connor. According to Jakush, her ministry consisted of the following:

> "Basically working with family. Trying to get families back together again where children were suffering because of families that have been broken up with broken marriages and a lot of them have been

caused by people who have stolen their souls and spirits from their parents and causes the marriage to break up."

Jakush testified that she was not associated with a specific church or location:

"A. It is like the church that John the Baptist or Mary Magdalene where you work independently and work strictly with the highest order from heaven on special projects.

Q. So there is no specific location for this church then?

A. No. Diabolical problems on earth or the problems that we are finding with people becoming diabolical, losing their souls and degenerating because of losing their souls,—

Q. Now, you mentioned—

A. —which is a disastrous happening that's been happening for the last year and a half. I don't know if you have been in touch with it."

Concerning Jakush's future plans, Jakush testified that she was not heading to any particular place in southern Illinois:

"A. *** We find that communication—if you get into a certain place, we deal strictly with everything in the subconscious mind regarding problems.

Q. You mentioned you were traveling alone though, right?

A. Yes, I work so closely with the [P]ope and everyone basically you just know where the need is, and I only find out the minute I need to go there. Nobody is talking to you. You just follow your soul ***."

The trial court's perception of the evidence is entitled to great weight. This evidence clearly established Jakush's inability to protect herself from serious harm.

"[The trial court] had the opportunity to see the respondent and witnesses and hear them testify and, therefore, is in a much superior position to determine credibility and weigh the evidence." *Knapp*, 231 Ill. App. 3d at 919, 596 N.E.2d at 1172.

The appellate court must affirm the trial court even if it would have ruled differently unless the trial court's finding was against the manifest weight of the evidence.

"A trial court's decision in an involuntary admission proceeding is given great deference and 'will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently' [citations], unless it is against the manifest weight of the evidence." *In re Bennett*, 251 Ill. App. 3d 887, 888, 623 N.E.2d 942, 944 (1993).

The only testimony presented was that of the doctor and Jakush. The trial court found the doctor to be credible and Jakush not. The trial court was in a position to assess the credibility of these witnesses

in a way that we cannot. While Jakush testified that she could feed and clothe herself, we cannot observe her manner while testifying, her speech pattern, her delivery, her appearance—whether disheveled or well-kept—her eye contact or nonverbal communication in court—or even her understanding of the proceedings or her appreciation of reality.

For these reasons, I would affirm the trial court's findings. To do otherwise is to substitute our findings for the trial court's when those findings are not against the manifest weight of the evidence.