*In re* NANCY A., Alleged to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Nancy A., Respondent-Appellant).

First District (3rd Division)   Nos. 1—02—0376, 1—02—0481, 1—02—1960 cons.

Opinion filed November 19, 2003.

Laurel W. Spahn and William E. Coffin, both of Guardianship and Advocacy Commission, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Gary Bisogni, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SOUTH delivered the opinion of the court:

These consolidated appeals arise from two orders of the circuit court of Cook County dated January 31, 2002, and June 20, 2002, finding respondent, Nancy A., to be a person subject to involuntary admission and ordering her to be hospitalized and rehospitalized, respectively, at Madden Mental Health Center for a period of up to 90 days.

The pertinent facts are as follows: On January 7, 2002, Antonia U., respondent's daughter, filed a petition seeking to have her mother involuntarily admitted to a mental health facility on the grounds that she was mentally and physically ill and would not leave the house to get help. Pursuant to that petition respondent was admitted to Madden Mental Health Center (Madden). The matter was set for a hearing on January 10, 2002. Prior to that date respondent filed a motion to dismiss the petition. On January 10, 2002, the State requested and was granted a continuance to January 17, 2002, in order to have time to prepare a response to the motion to dismiss and for the hospital to further evaluate respondent. On January 17, 2002, the State moved to voluntarily dismiss the petition for involuntary admission on the basis that it was defective due to the insufficiency of the allegations. The petition merely alleged that respondent was mentally confused and refused to leave the house to get medical attention or groceries, and that respondent believed the petitioner, Antonia, was working with the Federal Bureau of Investigation (FBI) and trying to kill her. The court granted the State's motion to dismiss the petition and entered an order discharging respondent. The State immediately thereafter requested an order for respondent's detention for further psychiatric evaluation and a new admission to Madden Mental Health Center, and an *ex parte* hearing on that request was conducted off the record. Respondent's counsel requested to participate in that hearing, but that request was denied by the court. At the conclusion of the hearing, the trial court entered an order for respondent's detention and further psychiatric evaluation.

While at Madden, respondent was evaluated by Drs. Frank G. Russo and Sudha Agrawal, who completed and filed physicians' certificates on January 18, 2002. A hearing on the new case was set for January 24, 2002, but on that date the State requested a one-week continuance, which the court granted to January 31, 2002.

On January 31, 2002, a hearing was conducted on the new petition for involuntary admission, wherein James Osta, a social worker at Madden, Dr. Russo, and respondent's daughter testified.

Antonia, respondent's daughter, testified that up until four years prior thereto she had been living with respondent and paying her rent and other bills. One day her mother demanded that she leave and pulled a knife on her. On January 3, 2002, when they were discussing the possibility of her being evicted by her landlord, respondent again pulled a knife on her daughter. During the last four years respondent has also thrown things at Antonia, slapped her and poked her with pens. Antonia testified that she continued to provide for all of respondent's needs even after she moved out.

Antonia further testified that respondent had refused to allow workmen to enter her apartment to repair the water pipes because she believed they were FBI operatives. In December of 2001, respondent would not let Antonia buy her groceries because she believed that she was conspiring with the FBI to poison her and that her apartment was being bugged.

Antonia also testified that her mother was diagnosed with a fibroid condition but refused follow-up treatment. Even though she complained almost on a daily basis about abdominal pains, respondent refused to leave her apartment, which she left only once in 1992 and once in 1994.

The next State witness was Dr. Frank G. Russo, a psychiatrist, who testified that respondent was suffering from a longitudinal history of delusional disorder and that she believed her daughter, landlord and others were conspiring against her and that the FBI infected her with syphilis in 1993. Dr. Russo opined that respondent would be unable to care for her basic needs if she were discharged based upon the facts that she was refusing food from her daughter and treatment for her medical needs, and that she had no specific plan if she were discharged. He also testified that she was a risk to others since she suffers from persecution ideation and might attack someone in what she believed would be a defensive measure. He based that opinion upon respondent's prior attacks on her daughter.

Dr. Russo concluded that the hospital would be the least restrictive alternative for respondent because she would continue to refuse to seek medical treatment and was refusing all help, money and food from her daughter. A report on an alternative treatment setting, a psychosocial assessment, a psychiatric evaluation and a treatment plan were admitted into evidence.

Respondent called James Osta as her witness. He is her social worker and a member of her treatment team. He testified that a less restrictive placement would be inappropriate for respondent because she is "floridly psychotic," penniless and homeless and requires 24-hour care.

Following closing arguments, the trial court found that the State had proven by clear and convincing evidence that respondent was mentally ill and unable to provide for her basic physical needs and ordered that she be involuntarily confined for a period of up to 90 days.

Respondent was hospitalized at Madden for the next 90 days, and on May 8, 2002, agreed to remain there on a voluntary basis. However, on May 30, 2002, respondent submitted a written request for discharge. The Madden staff responded by filing another petition for

involuntary admission along with two supporting physicians' certificates.

Pursuant to the new petition for involuntary admission, another hearing was conducted on June 20, 2002. At that hearing, Antonia, Dr. Russo and James Osta all testified again, and their testimony was essentially the same as it was in January of 2002.

Antonia testified that in May of 2002, while she was at Madden and having a conversation with her mother about where she would go and what she would do if she were released, respondent became very angry and threatened to kill her when she was released. She also spat in her daughter's face and told her that she was going to burn down her house. Antonia testified again that over the last four years respondent had slapped her, poked her with a pen and thrown things at her.

Dr. Russo testified that he was not respondent's treating psychiatrist at Madden but was covering for Dr. Agrawal, who had been called out of the country. Dr. Russo observed respondent on the unit on a regular basis and reviewed her medical records. Dr. Russo completed a physician's certificate on January 17, 2002. He also evaluated respondent on January 28, 29 and 30, 2002, and had conversations concerning her with hospital staff and Antonia, in addition to attending staff meetings concerning her treatment.

Dr. Russo testified that upon respondent's admission to Madden, she needed encouragement to bathe, dress and eat. She was inconsistent in accepting her medical treatment. While she generally took her thyroid medication and asked for and accepted treatment for indigestion, she refused tests and treatment after complaining of chest and abdominal pains and refused to be examined regarding her uterine fibroid.

Dr. Russo opined once again that respondent suffered from a longitudinal history of delusional disorder. He testified that respondent had a basis in reality for this disorder because a gentleman friend of hers was investigated by the FBI in the 1990s and federal agents approached her to testify against him. Based on that event, however, she developed a conspiracy theory which included her daughter, landlord and others. He also testified that respondent believes that the FBI infected her with syphilis in 1993.

Dr. Russo testified that respondent needed to be treated as an inpatient and that Madden would be the least restrictive alternative for her because she would not be able to care for her basic needs if she were discharged, since she was refusing food from her daughter and treatment for her medical needs. He further testified that her daughter's home or independent living would be an inappropriate set-

ting because respondent had "no insight" and was refusing all help from her daughter anyway, which included food and money. Dr. Russo opined that respondent's delusions would probably interfere with her eating outside the hospital setting because she was still under the belief that someone was poisoning her food. He also testified that respondent was a risk to others and might attack someone as a defensive measure because she suffered from persecution ideation, although he admitted that while at Madden she had not attempted to harm anyone or been involuntarily medicated, secluded or restrained.

Osta testified that he was responsible for investigating alternatives to hospitalization and methods of obtaining governmental benefits to pay for an alternative treatment setting. Alternative treatment settings provide 24-hour care and afford residents more freedom than hospitals. There are at least 50 alternative treatment settings in the Chicago area.

Osta testified that governmental benefits could not be obtained for respondent unless she signed the necessary forms herself or was declared incompetent and her court-appointed guardian signed the necessary forms. He stated that respondent refused to sign the forms, and although the process for obtaining a guardian for her had begun, no petition for guardianship had been filed as yet. He also testified that respondent could not be forced against her will to go to an alternative treatment setting, nor could an alternative treatment setting be forced to accept her.

Osta testified that he had not contacted any alternative treatment settings to inquire about the appropriateness of respondent's treatment outside of the hospital because it was his belief that alternative treatment settings would not accept clients who were refusing psychotropic medications, although there was no evidence that respondent was refusing psychotropic medications. Osta testified once again, however, that a less restrictive placement would be inappropriate for respondent because she is "floridly psychotic," penniless and homeless and needs 24-hour care. He also expressed concerns about her medical condition. Further, respondent admitted to him that she had spat in her daughter's face and threatened to kill her and burn down her house.

The next State witness, Dr. Agrawal, testified that she was respondent's original treating psychiatrist and diagnosed her as suffering from a delusional disorder. Dr. Agrawal opined that respondent was reasonably expected to inflict serious physical harm upon herself or her daughter in the near future and was unable to provide for her basic physical needs.

Respondent testified on her own behalf that she had not cooper-

ated with Osta regarding her social security income benefits because she does not believe that she has any type of mental disability, and she believes that the Justice Department owes her funds because the FBI poisoned her in June of 1993.

After closing arguments, the court found that respondent was mentally ill and unable to care for her basic physical needs. During the dispositional phase of the hearing to determine if there was a less restrictive alternative to full hospitalization, respondent did not present evidence or make any arguments.

On appeal, respondent has raised several assignments of error: (1) that the trial court committed reversible error in granting the State's January 24, 2002, request for a continuance; (2) that the trial court abused its discretion in granting the State's January 17, 2002, request to voluntarily dismiss the first petition; (3) that the trial court's January 31, 2002, order for respondent's involuntary admission must be reversed because the petition was neither prepared nor filed prior to the proceeding for the January 17, 2002, order for detention and evaluation; (4) that the trial court abused its discretion by prohibiting respondent's counsel from participating in the January 17, 2002, hearing for an order for detention and evaluation; (5) that the trial court's January 31, 2002, order must be reversed because respondent was denied her statutory right to a verbatim transcript of the January 17, 2002, hearing for the order for detention and evaluation; (6) that the trial court's finding on January 31, 2002, that respondent was unable to provide for her basic physical needs, requiring involuntary inpatient admission, was manifestly erroneous; (7) that the trial court's finding on June 20, 2002, that respondent was unable to provide for her basic physical needs, requiring involuntary inpatient admission, was manifestly erroneous; and (8) that the exception to the mootness doctrine applies to this case.

Initially, we shall address the last issue, whether this case falls within the mental health exception to the mootness doctrine, since both parties agree that the exception does apply.

■ As a general rule, courts of review in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. *In re Barbara H.*, 183 Ill. 2d 482, 491, 702 N.E.2d 555, 559 (1998). A moot question is one that existed but because of the happening of certain events has ceased to exist and no longer presents an actual controversy over the interest or rights of the party. *Johnson v. Quern*, 90 Ill. App. 3d 151, 155, 412 N.E.2d 1082, 1085 (1980). The appellate court has recognized an exception to this rule for mental health cases. *Barbara H.*, 183 Ill. 2d at 491, 702 N.E.2d at 559. Where a case involves

an event of short duration that is capable of repetition, yet evading review, it may qualify for review even if it would otherwise be moot. *Barbara H.*, 183 Ill. 2d at 491, 702 N.E.2d at 559.

■ To receive the benefit of this exception, the complaining party must demonstrate that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation; and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *Barbara H.*, 183 Ill. 2d at 491, 702 N.E.2d at 559. The exception to the mootness doctrine is of particular importance where commitment orders may have collateral legal consequences that survive the expiration of the order under review. *People v. Nunn*, 108 Ill. App. 3d 169, 173, 438 N.E.2d 1342, 1344 (1982). Even in the context of absolute discharge, collateral legal consequences may exist if the respondent was committed several times before, for at some point the number of commitments may make his reputation irredeemable. *Nunn*, 108 Ill. App. 3d at 173, 438 N.E.2d at 1344.

■ Here, the January 31 and June 20, 2002, orders for respondent's involuntary admission, which both expired within 90 days of their being entered, were too short to be fully litigated prior to their cessation. Further, there was a reasonable expectation that respondent would be subjected to the same action again. See *Barbara H.*, 183 Ill. 2d at 491, 702 N.E.2d at 559. Respondent may also suffer collateral consequences from the trial court's orders. See *Nunn*, 108 Ill. App. 3d at 173, 438 N.E.2d at 1344. For these reasons, we find that the exception to the mootness doctrine applies to this case.

We shall now turn our focus to the remaining issues. The first assignment of error is the order of the trial court on January 24, 2002, granting the State's request for a continuance to January 31, 2002.

■ The applicable statute is section 3—800 of the Mental Health and Developmental Disabilities Code (Code), which states in pertinent part:

> "(b) If the court grants a continuance on its own motion or upon the motion of one of the parties, the respondent may continue to be detained pending further order of the court. *Such continuance shall not extend beyond 15 days* except to the extent that continuances are requested by the respondent." (Emphasis added.) 405 ILCS 5/3—800 (West 2000).

The Code's procedural safeguards are not mere technicalities. Rather, they are essential tools to safeguard the liberty interests of respondents in mental health cases. *In re George O.*, 314 Ill. App. 3d 1044, 1046, 734 N.E.2d 13, 16 (2000). The need for strict compliance with the statutory requirement is compelling in mental health cases since com-

mitment is involuntary and liberty interests are involved. *In re Lanter*, 216 Ill. App. 3d 972, 974, 576 N.E.2d 1219, 1220 (1991). Because involuntary admission proceedings pose a grave threat to an individual's liberty interests, the Code's procedural safeguards should be strictly construed in favor of the respondent. *George O.*, 314 Ill. App. 3d at 1046, 734 N.E.2d at 16. Any noncompliance with the statutorily prescribed involuntary commitment procedures renders the judgment entered in such a cause erroneous and of no effect. *George O.*, 314 Ill. App. 3d at 1049, 734 N.E.2d at 17; *Lanter*, 216 Ill. App. 3d at 974, 576 N.E.2d at 1220.

■ A trial court's decision to grant or deny a motion to continue is a discretionary matter, and this court will not set aside the trial court's determination unless it amounts to an abuse of discretion. *People v. Hillsman*, 329 Ill. App. 3d 1110, 1118, 769 N.E.2d 1100, 1107 (2002). A decisive factor in determining the propriety of the trial court's exercise of its discretion in ruling on a motion for a continuance is whether the party applying for a continuance has shown a lack of due diligence in proceeding with the cause. *Lipke v. Celotex Corp.*, 153 Ill. App. 3d 498, 510, 505 N.E.2d 1213, 1221 (1987).

Here, the State filed its first petition for involuntary admission on January 7, 2002, and respondent filed a motion to dismiss. On January 10, 2002, at the hearing on the petition the State requested a continuance to respond to the motion to dismiss and for further evaluation of respondent. On January 17, 2002, the State withdrew its petition when it realized it was defective and requested a hearing to obtain an order of detention. The trial court granted the State's voluntary dismissal and discharged respondent. After the hearing, the court entered an order of detention requiring respondent to be transported back to the hospital for a court-ordered evaluation. The State then filed another petition for involuntary admission on January 17, 2002, and the two physicians' certificates on January 18, 2002. The new hearing was set for January 24, 2002, and on that date the State sought a continuance for further evaluation, which the trial court granted to January 31, 2002.

■ Based upon these procedural facts, we find the lower court did not abuse its discretion in continuing the case from January 24, 2002, until January 31, 2002. Section 3—800 of the Code provides that a continuance shall not extend beyond 15 days, and clearly the seven-day continuance from the 24th of January to the 31st of January did not violate this time period. As the State has pointed out in its appellate brief, there were eight days left for continuances on the first petition. The first petition, which was filled out by Antonia, was legally insufficient, and clearly the State needed time within which to file a

petition that contained legally sufficient allegations. There is nothing to suggest that the State was being dilatory or attempting to circumvent the statutory requirements. In fact, to the contrary, the State was making every attempt to see that respondent's fundamental right to due process was upheld. For these reasons, we find that the court's decision to grant the State the one-week continuance was not an abuse of discretion.

As to the State's request for a continuance on January 17, 2002, the trial court granted the State's motion to voluntarily dismiss and discharged respondent on that case. The court found that the second petition was a new cause of action and acted well within its discretion to allow the State a 15-day continuance in the second case. For the reasons stated above, we find no abuse of discretion by the trial court.

We also consider whether the trial court abused its discretion in granting the State's January 17, 2002, request to voluntarily dismiss the first petition.

■ A plaintiff is generally entitled to voluntarily dismiss his or her case at any time before trial or hearing begins. *Winn v. Mitsubishi Motor Manufacturing of America, Inc.*, 308 Ill. App. 3d 1054, 1058, 721 N.E.2d 819, 822 (1999). Plaintiffs have an almost absolute right to take a voluntary dismissal absent an unequivocal conflict between a specific rule of the supreme court and section 2—1009 of the Illinois Code of Civil Procedure. 735 ILCS 5/2—1009 (West 2000); *Winn*, 308 Ill. App. 3d at 1058, 721 N.E.2d at 822. When plaintiffs move for voluntary dismissal, trial judges have discretion to hear a previously filed motion that, if ruled upon favorably by the court, could result in a final disposition of the case. *Winn*, 308 Ill. App. 3d at 1058, 721 N.E.2d at 822-23. Absent such a circumstance, the trial judge generally has no discretion to deny the motion to voluntarily dismiss. *Winn*, 308 Ill. App. 3d at 1058, 721 N.E.2d at 823.

■ In granting the State's voluntary dismissal without considering respondent's motion to dismiss, the court noted that on January 10, 2002, the State could have, upon receiving respondent's motion to dismiss, asked for leave to file an amended petition or taken a nonsuit at that time, but because the State only had 15 days and its attorneys are overworked, it was going to allow the State to take a nonsuit on the petition. The trial court's decision to grant a plaintiff's motion for voluntary dismissal without considering a potentially dispositive defense motion will not be reversed unless there was abuse of discretion. *Bochantin v. Petroff*, 145 Ill. 2d 1, 7, 582 N.E.2d 114, 117 (1991). We find no such abuse.

We next consider whether the trial court's January 31, 2002, order for respondent's involuntary admission should be reversed because

the petition was neither prepared nor filed prior to the proceeding for the January 17, 2002, order for detention and evaluation.

■ Involuntary commitment proceedings involve a person's liberty interests and, thus, the statutory sections of the Code should be construed strictly in favor of the respondent. *In re Demir*, 322 Ill. App. 3d 989, 992, 751 N.E.2d 616, 618 (2001). Inherent in the civil commitment proceeding are the distinct interests of providing patients with necessary treatment as well as protecting society from dangerous conduct. *Demir*, 322 Ill. App. 3d at 992, 751 N.E.2d at 618. The procedural safeguards in place are not mere technicalities to be sidestepped. Rather, the legislature created them to protect people from the deprivation of a liberty interest. *Demir*, 322 Ill. App. 3d at 994, 751 N.E.2d at 619. The failure to timely file the petition is an error that cannot be waived or considered harmless. *Demir*, 322 Ill. App. 3d at 994, 751 N.E.2d at 620. Section 3—611 of the Code creates a bright-line test with which the facility director must strictly comply. *Demir*, 322 Ill. App. 3d at 994, 751 N.E.2d at 620.

On January 17, 2002, after the State voluntarily dismissed the defective petition for involuntary admission, the court signed an order discharging respondent, and the State requested a hearing for an order of detention requiring the Madden staff to take respondent to the hospital for a psychiatric evaluation and a new admission. An *ex parte* hearing was held off the record which resulted in the court signing an order for the detention and evaluation of respondent which, along with the petition for involuntary admission, was filed with the clerk of the court on January 17, 2002. On January 31, 2002, the hearing on the petition for involuntary admission was held, and the court ordered that respondent be involuntarily confined for up to 90 days because she was mentally ill and unable to provide for her basic physical needs.

Respondent argues that the court improperly entertained the State's "oral" request for relief and ignored the Code's requirement that a "written" petition must be prepared and filed prior to the hearing.

■ Section 3—701 of the Code states in pertinent part:

"(a) Any person 18 years of age or older may execute a petition asserting that another person is subject to involuntary admission. The petition shall be prepared pursuant to paragraph (b) of Section 3—601 and shall be filed with the court in the county where the respondent resides or is present." 405 ILCS 5/3—701 (West 2000).

Section 3—611 of the Code states in pertinent part:

"Within 24 hours, excluding Saturdays, Sundays and holidays, after the respondent's admission under this Article, the facility

director of the facility shall file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located. Upon completion of the second certificate, the facility director shall promptly file it with the court. *** Upon the filing of the petition and first certificate, the court shall set a hearing to be held within 5 days, excluding Saturdays, Sundays and holidays, after receipt of the petition." 405 ILCS 5/3—611 (West 2000).

■ In the case at bar, the record demonstrates that a written petition was filed within 24 hours of respondent's admission to Madden. On January 17, 2002, the first petition was nonsuited and respondent discharged, and then a hearing was conducted off the record on the State's motion or request for an order for detention and a psychiatric evaluation. Prior to that hearing, a new petition was drafted and signed by the petitioner. An order of detention was also drafted, which the trial court signed at the conclusion of the hearing. We find that the State complied with section 3—611 of the Code. While the petition was drafted but not filed prior to the hearing, there is no requirement in section 3—701 which requires that it be filed prior thereto. What is clear, however, is that a written petition was filed within 24 hours of respondent's admission in accordance with sections 3—611 and 3—701 of the Code.

■ We next consider whether the trial court abused its discretion by prohibiting respondent's counsel from participating in the January 17, 2002, proceeding for an order for detention and evaluation.

Under section 3—701(b), "the court may inquire of the petitioner whether there are reasonable grounds to believe that the facts stated in the petition [for involuntary admission] are true and whether the respondent is subject to involuntary admission. The inquiry may proceed without notice to the respondent only if the petitioner alleges facts showing that an emergency exists such that immediate hospitalization is necessary." 405 ILCS 5/3—701(b) (West 2000).

Involuntary commitment hearings conducted pursuant to the Code are civil matters subject to the Illinois Code of Civil Procedure. 735 ILCS 5/2—101 (West 2000); 405 ILCS 5/6—100 (West 2000); *In re Lawrence S.*, 319 Ill. App. 3d 476, 482, 746 N.E.2d 769, 774 (2001). The constitutional rights to which a defendant in a criminal proceeding is entitled do not adhere to a respondent in a commitment hearing. However, because the State seeks to curtail the respondent's liberty in an involuntary commitment hearing, the supreme court has held that procedural due process does guarantee certain protections to civil commitment respondents. *Lawrence S.*, 319 Ill. App. 3d at 482-83,

746 N.E.2d at 775. The Code provides that every respondent alleged to be subject to involuntary admission shall be represented by counsel. 405 ILCS 5/3—805 (West 2000); *In re Click*, 196 Ill. App. 3d 413, 419, 554 N.E.2d 494, 497 (1990).

On January 17, 2002, the lower court stated that it found no provision in the Code that would allow counsel to participate in an *ex parte* hearing because there was no lawsuit pending as yet. Under the Code, a hearing is set within five days and notice is then given to the patient and his attorney once that patient is evaluated and admitted. This was an emergency hearing for an order of detention. Normally, due to their emergency nature, detention hearings are conducted on an *ex parte* basis. Here, the trial court informed counsel that there was no lawsuit pending, and if there is no lawsuit pending, she did not have a client and did not represent anyone. Whether or not respondent's counsel could have participated in that hearing since she was present was within the discretion of the trial court. We find that the court did not abuse its discretion in prohibiting respondent's attorney from participating.

Respondent also argues that she was entitled to a transcript of that proceeding. However, the hearing was conducted off the record so there is no transcript. Furthermore, there is no requirement in the Code that detention hearings be conducted on the record, and respondent has not stated how the lack of a transcript has prejudiced her. For these reasons, her arguments must fail.

We next consider whether the trial court's findings on January 31, 2002, that respondent was unable to provide for her basic physical needs and required involuntary inpatient admission were manifestly erroneous.

■ A trial court's decision in an involuntary admission proceeding is given great deference and will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently, unless it is against the manifest weight of the evidence. *In re Bennett*, 251 Ill. App. 3d 887, 888, 623 N.E.2d 942, 943 (1993). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *In re Jakush*, 311 Ill. App. 3d 940, 944, 725 N.E.2d 785, 789 (2000). The original trier of fact is in the best position to weigh the evidence presented and determine the credibility of the testifying witnesses. *Bennett*, 251 Ill. App. 3d at 888, 623 N.E.2d at 943.

■ Under section 1—119(2) of the Code, a person subject to involuntary admission is a person with mental illness and who because of her illness is unable to provide for her basic physical needs so as to

guard herself from serious harm. 405 ILCS 5/1—119(2) (West 2000); *Jakush*, 311 Ill. App. 3d at 944, 725 N.E.2d at 788. Generally, the inability to care for oneself so as to guard against physical harm is found when the illness substantially impairs one's thought processes, perception of reality, emotional stability, judgment, behavior, or ability to cope with life's ordinary demands. *In re Long*, 237 Ill. App. 3d 105, 110, 606 N.E.2d 1259, 1263 (1992). In determining whether a person's illness renders her unable to provide for her basic physical needs, a court should consider whether that person (1) can obtain her own food, shelter, or necessary medical care; (2) has a place to live or a family to assist her; (3) is able to function in society; and (4) has an understanding of money or a concern for money as a means of sustenance. *Jakush*, 311 Ill. App. 3d at 944, 725 N.E.2d at 788.

■ Involuntary commitment procedures represent the balance between an individual's liberty interests and society's dual interests in protecting itself from potentially dangerous individuals while protecting and caring for those who are unable to care for themselves. *In re Luttrell*, 261 Ill. App. 3d 221, 231, 633 N.E.2d 74, 81-82 (1994). A person may not be confined against her will merely because she is mentally ill if she is dangerous to no one and can live safely in freedom. *In re Winters*, 255 Ill. App. 3d 605, 608, 627 N.E.2d 410, 413 (1994). A person may not be held against her will merely to improve her standard of living or because society may find it uncomfortable to see such people on the street. *Winters*, 255 Ill. App. 3d at 610, 627 N.E.2d at 414. In order to commit a person involuntarily to a mental health facility, the State must prove by clear and convincing evidence that a person is mentally ill and that, as a result of this illness, he is reasonably expected to inflict serious physical harm upon himself or another in the near future, or is unable to protect himself from serious harm. 405 ILCS 5/1—100 *et seq.* (West 2000); *In re Tuman*, 268 Ill. App. 3d 106, 111, 644 N.E.2d 56, 59 (1994). Proof of mental illness alone is not sufficient to support involuntary admission. *Jakush*, 311 Ill. App. 3d at 944, 725 N.E.2d at 788. For a medical opinion as to the existence of a mental illness to be clear and convincing, it is sufficient if the expert indicates the basis of his diagnosis by having directly observed a respondent on several occasions. *Tuman*, 268 Ill. App. 3d at 111, 644 N.E.2d at 59-60.

After a court determines that a person is subject to involuntary commitment, the court must order the respondent's placement in the least restrictive treatment alternative. 405 ILCS 5/3—811 (West 2000); *Long*, 237 Ill. App. 3d at 111, 606 N.E.2d at 1264. The court has several options at its disposal: ordering hospitalization, ordering outpatient treatment, or ordering the person to be placed in the care of a relative

or other person willing to care properly for him. 405 ILCS 5/3—811 (West 2000); *Luttrell*, 261 Ill. App. 3d at 226, 633 N.E.2d at 78. However, there is a statutory preference for treatment other than hospitalization. Thus, hospitalization may only be ordered if the State proves it is the least restrictive treatment alternative. *Luttrell*, 261 Ill. App. 3d at 226, 633 N.E.2d at 78.

■ The evidence to support these findings that respondent is mentally ill and cannot support herself must concern the respondent's current condition, and the decision to commit the respondent must be based on a fresh evaluation of her conduct and mental state. *Long*, 237 Ill. App. 3d at 109, 606 N.E.2d at 1262. The requirement that the State prove hospitalization is the least restrictive treatment alternative is not met merely because the State's expert opines commitment is the least restrictive means. The opinion of the expert must be supported by the evidence. *Luttrell*, 261 Ill. App. 3d at 227, 633 N.E.2d at 78.

■ Turning to the case at bar, on January 31, 2002, the State established through clear and convincing evidence that respondent was mentally ill based upon the testimony of Dr. Russo that respondent suffered from a longitudinal delusional disorder and was paranoid, depressed and psychotic and Antonia's testimony that respondent was a danger to others. The totality of the evidence relating to respondent's medical illness, delusional behavior and paranoia established that she lacked the ability to care for her basic needs, especially since she refused her daughter's assistance. The evidence also established that since respondent's hospitalization she has shown that while she can perform basic functions, there is no indication that she can care for herself outside of the controlled environment of the hospital due to her extreme paranoia.

Regarding the issue of the least restrictive alternative, there was clear and convincing evidence that no type of intermediate care facility would accept respondent and that respondent could not meet her basic needs outside of a full-care hospital facility. Antonia testified that she is limited in what she can do to support her mother because she has had to refinance her house and has "maxed out" her credit cards, and that respondent believed she was being given shots by the doctor who was conspiring with the FBI.

Dr. Agrawal testified that, as a result of respondent's delusions, she has refused tests and treatment for her medical condition and is unable to care for her basic needs. Dr. Agrawal opined that due to respondent's mental condition she is unable to make rational decisions about her medical condition and living arrangements, and that all of these were reasons why no intermediate-care facility would ac-

cept her and why she did not qualify for less restrictive alternative outside of a full-care hospital facility.

Based upon the facts as presented at the hearings, we find that the trial court's findings that respondent was mentally ill and unable to provide for her basic physical needs and that a full-care hospital facility was the least restrictive alternative were not against the manifest weight of the evidence.

We next consider whether the trial court's findings on June 20, 2002, that respondent was unable to provide for her basic physical needs and required involuntary inpatient admission were manifestly erroneous.

The evidence present at that hearing was essentially the same evidence which had been presented at the January 31, 2002, hearing. Respondent argues that she was eating appropriately, was not underweight, was not refusing any essential medical treatment and could find shelter either by herself or with the assistance of her daughter, and that the State did not file an adequate predispositional report and failed to prove that inpatient hospitalization was the least restrictive alternative.

The court concluded that the least restrictive alternative at the current time was the hospital in large part because of respondent's lack of cooperation and her delusional behavior. Furthermore, respondent testified that if she were released she did not know where she would go and was comfortable at Madden. The court noted that if respondent was cooperative perhaps a less restrictive alternative could be found, but until then the hospital was the best place for her.

The original trier of fact is in the best position to weigh the evidence presented and determine the credibility of the testifying witnesses. *Bennett*, 251 Ill. App. 3d at 888, 623 N.E.2d at 943. The lower court weighed the evidence and testimony and concluded that respondent was properly involuntarily admitted. We find that, based upon the evidence, the trial court's decision was not against the manifest weight of the evidence. See *In re E.L.*, 316 Ill. App. 3d 598, 605, 736 N.E.2d 1189, 1194 (2000).

For the foregoing reasons, the judgment of the lower court is affirmed.

Affirmed.

HOFFMAN, P.J., and HALL, J., concur.