No. 2--06--0806     Filed: 9-28-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re ANGEL S., Alleged to be a Person Subject to Involuntary Admission | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| | | No. 06--MH--628 |
| (The People of the State of Illinois, Petitioner-Appellee, v. Angel S., Respondent-Appellant). | | Honorable Patrick L. Heaslip, Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

Respondent, Angel S., appeals from the trial court's order finding her to be a person subject to involuntary admission and committing her to the Department of Mental Health for 90 days. On appeal, respondent challenges the order on the bases that (1) the State failed to present clear and convincing evidence that because of her mental illness she was unable to provide for her basic physical needs, and (2) the trial court failed to consider less restrictive treatment alternatives to hospitalization. We agree with respondent's second contention and reverse.

BACKGROUND

On August 7, 2006, Sheila Dock, a counselor at Swedish American Hospital, filed a petition for involuntary admission, alleging that respondent was mentally ill and by reason of her mental illness was unable to provide for her basic physical needs so as to guard herself from serious harm. The petition was accompanied by the certificates of two psychiatrists. On August 15, 2006, the trial

court held a hearing on the matter. The facts presented below are derived from the evidence presented at that hearing.

Sheila Dock testified that she is the assessment and referral counselor in the emergency room of Swedish American Hospital. Her position entails meeting with patients who suffer from mental illness and referring the patients to the most suitable placement. Dock testified that on August 5, 2006, respondent came to the emergency room stating that she had suffered burns to her neck from a ventilator in her car. Dock did not observe any burns to respondent's neck. Respondent further stated that there was an invisible man stabbing her in the chest. Dock testified that respondent was delusional and very hostile. Respondent reported that she was not sleeping much. Respondent denied that she was on medication and denied that she had been seeing a mental health counselor. Dock then checked the hospital's computer system and determined that at respondent's last hospital visit, respondent was taking psychotropic medications, which she had now stopped taking. Dock also determined that respondent had made previous visits to the Janet Wattles Center, which provides mental health services. Later that evening, a counselor from the Janet Wattles Center came to the hospital to assess respondent. The counselor recommended that respondent be hospitalized. Dock in turn filed the petition for involuntary admission.

Dock further testified that during respondent's stay at the hospital, respondent ignored the hospital staff's request to stay in her room and instead would circle around the nurses' station, mumbling unintelligibly to herself. Respondent was very agitated and upset. Dock believed that respondent was unable to care for herself due to her delusional state. Dock also testified that respondent drove herself to the hospital but that it was unsafe for respondent to drive at this time.

On cross-examination, Dock admitted that respondent arrived at the hospital safely in her own car. Dock was also told that respondent had a place to live. Dock stated that respondent did not appear to be malnourished and that respondent's appetite was normal. Dock never questioned respondent about how she obtained food, if she cooked for herself, or whether she had any financial means of support. Dock also failed to evaluate whether respondent had an understanding of money. Dock testified that although respondent had been previously prescribed medication, it was possible that respondent was not currently under a doctor's order to take medication.

Next, Joann Langley, a licensed clinical psychologist, testified that she was appointed by the court to examine respondent. Langley examined respondent on August 7, 2006, and again briefly on the day of the hearing. During both examinations, respondent exhibited signs of mental illness, including delusions, paranoid ideation, agitation, and hostility. Langley opined that respondent suffered from paranoid schizophrenia. Langley came to this conclusion based on respondent's beliefs that her identity and money had been stolen and that she had been placed in the hospital by mistake. Respondent insisted that another person by the same name must be responsible for this situation. Respondent also stated that someone was tampering with her mailbox, preventing her from receiving her medications. Langley explained that it is common for a person with paranoid schizophrenia to believe that her identity or thoughts are being stolen, or that ideas are being inserted into her brain.

When Langley reviewed with respondent the petition seeking involuntary admission, respondent explained that her comments in the emergency room were misunderstood and that it only felt like someone was stabbing her in the chest. Respondent also explained that the heat vent in her car had been focused on her neck, causing the burning to her neck.

During her hospital stay, respondent was very hostile toward the hospital staff and would yell, swear, and make derogatory remarks about them. Respondent accused the staff of fabricating lies and accused Langley of being an advocate for the devil. Respondent expressed fear that the staff would assault and rape her. Langley witnessed a phone conversation between respondent and her case manager, where respondent screamed into the phone and insisted that her money, belongings, and identity were being stolen. On August 15, Langley was unable to finish her interview because respondent was speaking over Langley in a loud voice and eventually respondent simply left the room.

Langley opined that respondent was mentally ill and because of her illness was unable to provide for her basic care. Langley considers several criteria in making such a determination, including whether the patient has a place to stay, and in this case respondent indicated that she had an apartment. Langley did not, however, verify this information. Langley would also generally ask a patient how she would receive medical care, how she would obtain food, and how she would keep herself safe. Langley did not provide respondent's responses to these specific questions, although Langley later reported that respondent was not forthcoming with information during the interviews. Respondent refused to discuss food, money, or whether she had family or friends who could provide her with assistance. Respondent stated that she was with the military, and Langley verified with the Veteran's Administration that respondent was indeed a veteran and a patient. Langley testified that respondent sought medical attention on her own and that while at the hospital she agreed to receive an electrocardiogram.

Langley further testified that, while at the hospital, respondent was receiving "emergency medication" that is "ordered through restriction of rights when a person is evaluated as being at risk

of harming themselves, someone else, or at risk of decompensating to the point where there would be serious problems." The emergency medication was ordered on August 9, five days after respondent's initial hospitalization, because respondent was screaming, pounding on a desk, and threatening to break furniture.

A report prepared by Langley was also before the court. Langley did not testify regarding the report, but the report reveals that respondent was being treated by a psychiatrist and a social worker with the Veteran's Care Facility. Also, the report reveals that respondent stated that she rents an apartment but she became angry and suspicious when Langley asked about it.

Langley further explained that her primary concern was respondent's lack of trust. Langley opined that while respondent would probably be safe in her own home and possibly at the clinic where she receives treatment, respondent "would have difficulty getting to and from anywhere." Because of her extreme paranoia, her argumentativeness, and her belief that people are trying to harm her, Langley opined that respondent would have difficulty with many activities, including shopping in a store, taking a bus, accepting a policeman's assistance, and waiting in a clinic waiting room. Langley further testified that if respondent had enough food in her apartment, she could probably survive for a period of time without any assistance, but otherwise, respondent would be unable to care for herself at the present time.

After the presentation of the evidence, the trial court found that it was clear that respondent suffered from paranoid schizophrenia. The court noted that it next had to decide whether respondent could provide for her basic physical needs without outside assistance. In that regard, the court found as follows:

"The problem is her actions coming to the hospital pretty much establish that she can provide for herself without assistance. She comes to the hospital believing that she is suffering from an injury, which is nonexistent.

I'm going to find that the State has shown by clear and convincing evidence that she suffers from mental illness, which does prevent her from providing for her basic physical needs without the assistance of outside help."

The trial court ruled that respondent was subject to involuntary admission. The court then proceeded to determine the proper disposition.

Daniel Grohens testified that he is the director of social work at Singer Mental Health and Developmental Center. Grohens completed a dispositional report in this case during a 15-minute court recess following the court's finding that respondent was subject to involuntary admission. Grohens prepared the report because the assigned social worker was on vacation. Grohens recommended that respondent be hospitalized because "[t]here is no alternative to hospitalization due to the findings of the Court about inability to care for herself." He further explained that respondent does not recognize that she has a mental illness and therefore she would not pursue outpatient aftercare. Furthermore, the likelihood of her pursuing assistance from other people would be "about nil." He further testified that "historically" there have been only a "couple of instances of out-patient commitment to the community." When asked if he believed that outpatient treatment would be appropriate in this case, Grohens responded that the signatory of the report, who in this case was psychiatrist William Woods, is the one really making the recommendation and it "is not [Grohens'] role ever to determine the level of after care needed." Grohens testified that by signing the report, Woods agreed with 90 days of hospitalization for respondent.

On cross-examination, when asked what alternatives he considered, Grohens merely replied that "[t]he alternatives to treatment were investigated at the point of admission." The following exchange then took place:

"Q. That doesn't answer my question. In the last 15 minutes, what alternatives at this point did you investigate?

A. Well, I asked the case worker, Dennis, does she go to Janet Wattles, and he said she's a--this is the area from which she comes. So she falls within a catchment area of Wattles were the patient involved with any psychiatric after-care services.

Q. Let's look at the other alternatives.

A. She would not have been admitted mostly. She--her symptoms would have been controlled.

Q. That doesn't answer my question. Janet Wattles is an alternative, did you contact them in the last 15 minutes?

A. Janet Wattles was one of the, I think, petitioners for her hospitalization.

Q. Did you have contact with them or not in the last 15 minutes ***?

A. No.

Q. She's a veteran, did you contact the Veterans Administration at Milwaukee or Madison?

A. Do you want a complete answer or are deriving for a--

Q. I want to know, Dr. Grohens, did you contact them within the last 15 minutes.

A. No, I did not.

* * *

Q. In creating this dispositional evaluation in the last 15 minutes, did you contact any group homes, nursing homes or other community mental health service providers?

A. Of course not."

The State argued that there were really only two alternatives available, either to release respondent or to hospitalize her. Respondent's counsel, on the other hand, argued that there were many alternatives to discharge or hospitalization, including nursing homes, group homes, and out-patient treatment. To this the State responded:

"I think it's a complete mischaracterization to say that the State has--should give the Court all the alternatives to hospitalization. There is a course in the history in Winnebago County that there isn't involuntary commitment with out-patient counseling.

The history in Winnebago County is that if there is involuntary commitment, that the least restrictive environment at that point is hospitalization."

The court found that it was evident that respondent does not recognize that she suffers from a mental illness and is not seeking treatment. With treatment, the court felt that respondent "could probably live a normal life." The court further concluded:

"Unfortunately, *** what you are asking me to do is to release her to the most--least restrictive form of treatment, but there's no indication that she would follow through with that.

It would be one thing if she said you're right, I have got this problem, I'll seek treatment. I'll get treatment at Janet Wattles or through some other least restrictive placement, but she isn't saying that.

And, frankly, it's my experience, that unless she's forced into treatment at this point, I don't think her issues can be properly addressed.

I would hope in time that after she is released *** that she will follow through with after-care, that her condition will be treated, and she probably could live a pretty normal life if she continues with treatment and takes the prescribed medications.

But at this point, I know hospitalization is the most restrictive. But given the set of facts and circumstances, I think it's the least restrictive when you take into consideration everything that's been presented here today."

ANALYSIS

Initially, we note that the trial court's order has expired by its own terms. Consequently, this case normally would be moot, but the character of an involuntary admission is "of sufficient significance to permit the invoking of the 'collateral consequence' exception to the mootness doctrine." In re Hays, 102 Ill. 2d 314, 317 (1984). Thus, we review this appeal, but we reach only respondent's second contention, as we find it dispositive.

After a court determines that a respondent is subject to involuntary admission, the court must order the respondent's placement in the least restrictive treatment alternative that is appropriate. 405 ILCS 5/3--811 (West 2006); In re Nancy A., 344 Ill. App. 3d 540, 555 (2003). Section 3--811 of the Mental Health and Developmental Disabilities Code (Code) provides in relevant part as follows:

"If any person is found subject to involuntary admission, the court shall consider alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization. The court may order the respondent to undergo a program of hospitalization in a mental health facility designated by the Department, in a

licensed private hospital or private mental health facility if it agrees, or in a facility of the United States Veterans Administration if it agrees; or the court may order the respondent to undergo a program of alternative treatment; or the court may place the respondent in the care and custody of a relative or other person willing and able to properly care for him or her. The court shall order the least restrictive alternative for treatment which is appropriate." 405 ILCS 5/3--811 (West 2006).

Thus, the court has several treatment options: ordering hospitalization, ordering outpatient treatment, or ordering the person to be placed in the care of a relative or other person willing to care properly for her. 405 ILCS 5/3--811 (West 2006); Nancy A., 344 Ill. App. 3d at 555-56. "However, there is a statutory preference for treatment other than hospitalization." Nancy A., 344 Ill. App. 3d at 556. Hospitalization may be ordered only if the State proves that it is the least restrictive treatment alternative. Nancy A., 344 Ill. App. 3d at 556; In re Luttrell, 261 Ill. App. 3d 221, 226 (1994). This requirement is not met merely because the State's expert opines that commitment is the least restrictive placement; the expert's opinion must be supported by the evidence. Nancy A., 344 Ill. App. 3d at 556; Luttrell, 261 Ill. App. 3d at 227.

The trial court's decision in an involuntary admission proceeding is accorded great deference because the trial court is in the best position to determine the credibility of the witnesses and weigh the evidence. Nancy A., 344 Ill. App. 3d at 554. Its finding will not be reversed unless it is against the manifest weight of the evidence. Nancy A., 344 Ill. App. 3d at 554. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the finding is unreasonable, arbitrary, or not based on evidence. Nancy A., 344 Ill. App. 3d at 554.

Here, the State failed to prove that commitment to a mental health facility was the least restrictive alternative. Grohens did not explore any intermediate care facilities or other less restrictive alternatives. Instead, Grohens recommended hospitalization simply because "[t]here is no alternative to hospitalization due to the findings of the Court about inability to care for herself." Furthermore, Grohens testified that it is never his job to determine the level of after care needed. Thus, any testimony he did offer was of limited value.

We are especially bothered by the State's assertion that hospitalization is the only option it considers in involuntary admission cases. The procedural safeguards enacted by the legislature are not mere technicalities; rather, they are intended to safeguard the important liberty interests at issue in mental health cases. Luttrell, 261 Ill. App. 3d at 230. The total disregard for the legislatively established procedures is unacceptable.

In light of the statutory preference for treatment other than hospitalization, we conclude that the trial court's finding that hospitalization was the least restrictive alternative was against the manifest weight of the evidence. Accordingly, we reverse the involuntary admission order. See Luttrell, 261 Ill. App. 3d at 232.

The judgment of the circuit court of Winnebago County is reversed.

Reversed.

GROMETER, P.J., and BOWMAN, J., concur.